## MICOU *v.* NATIONAL BANK.

This case involves only disputed questions of fact, and the court, upon a consideration of the proofs, holds that certain decrees against a guardian in favor of his wards, whereunder his real estate was purchased by them, they being his children and he insolvent, were not procured by him to be rendered with the intent thereby to hinder, delay, and defraud his creditors.

APPEAL from the Circuit Court of the United States for the Middle District of Alabama.

The facts are stated in the opinion of the court.

The case was argued by *Mr. William A. Gunter* and *Mr. Philip Phillips*, with whom was *Mr. W. Hallett Phillips*, for the appellants, and by *Mr. David Clopton* and *Mr. Hilary A. Herbert*, with whom was *Mr. Samuel F. Rice*, for the appellee.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

This is a bill in equity, filed by the First National Bank of Montgomery, to subject to the payment of a judgment recovered by it against Benjamin H. Micou, Thomas M. Barnett, and Nicholas D. Barnett, partners, as Barnett, Micou, & Co., certain lands the legal title to which had been transferred to Henry C. Semple, in trust for Lucy B. Micou, and Clara E. Boykin, wife of Frank S. Boykin, all of whom, together with Benjamin H. Micou, were defendants below, the conveyance being, as charged, in fraud of the complainant's rights as a creditor.

The indebtedness on which the judgment is founded existed

at the time of the occurrence of the transactions which form the subject of the controversy.

The fraud charged in the bill is that Benjamin H. Micou, being at the time guardian in the Probate Court of Tallapoosa County, Alabama, of his daughters, Clara E. Boykin and Lucy B. Micou, confederated and colluded with them, and with Frank S. Boykin, husband of Clara, to procure judgments and decrees to be entered up against himself by said Probate Court in the matter of said guardianships, and to have all of his property liable to sale under legal process, except such personal property as they might aid him to fraudulently convert to his own use, and excepting some property bought by another creditor, sold and transferred to his said daughters, with the intent on the part of all of said parties thereby to hinder, delay, and defraud the creditors of the said Benjamin H. Micou, he being at the time insolvent.

By virtue of this conspiracy, it is alleged that settlements and decrees were caused to be made in said Probate Court, whereby it was falsely and fraudulently made to appear that on Feb. 10, 1874, the said Benjamin H. Micou was indebted to Clara E. in the sum of $88,300, for which sum a decree was rendered in said court in favor of Clara and her husband against him; and that on Feb. 24, 1874, said Micou was indebted to Lucy B. in the sum of $88,031.77, for which sum a decree was rendered in said court in her favor. Copies of the proceedings in the Probate Court are exhibited. At the time of the settlement with her, Lucy was a minor over the age of nineteen years.

It is charged in the bill that in making said settlements Micou "did not contend for or desire fair and proper settlements, and that there was no real effort on his part to introduce, as he had it in his power to do, or inform his attorney of evidence to show that he was not, as your orator avers he was not, chargeable with the amounts and sums he permitted to be found against him by collusion" with his daughter and son-in-law.

The bill further states as follows: "Orator is without any means of showing in this bill the particular items and amounts improperly and collusively charged against said Benjamin

H. Micou, and items for which he should have received credit in such settlements, further than is herein shown, the facts upon which said settlements ought to have been made being peculiarly within the knowledge of said B. H. Micou and the other defendants hereto and not of your orator; but orator charges that the item of ninety-one thousand six hundred and forty-eight and $\frac{95}{100}$ dollars with which the said Benjamin H. allowed his account to be surcharged on said settlement was not, and was known to the said Benjamin H. and to the said Clara E., Frank S., and Lucy B., not to be, legally and justly due from him ; that each item of negro hire, of which said sum is partly made up, was, if said Benjamin H. was rightly chargeable with any part thereof, charged at too high a rate, and that said sum of ninety-four thousand seven hundred and ninety-nine and $\frac{95}{100}$ dollars was too much by a large sum, of, to wit, fifty thousand dollars, and that this could have been shown to the court by testimony, if he, the said Benjamin H., had desired to make a fair and valid settlement.

" Orator further charges that said Benjamin H. was not, and he and his said daughters then well knew that he was not, chargeable with the large sums, or any part thereof, shown in Exhibit A and B to have been charged against him for negro hire and land rent, for that, as orator charges, the said B. H. Micou was, by orders of said Probate Court, made as shown by the full and true copies thereof hereto attached, and marked Exhibit D, and prayed to be taken as part of this bill of complaint, authorized to keep his said daughters' property together, and he was only liable to account for the profits arising from the same, which were small.".

The decrees referred to were rendered in February, 1874, and by the law of Alabama (Code of Ala., sect. 2794) it is provided that "all final decrees against guardians have the force and effect of judgments at law, upon which execution may issue against them and the securities on their bonds."

The two brothers Barnett, who were partners of Micou, were also his brothers-in-law, uncles of Clara E. and Lucy, his daughters and wards, and were sureties on his bond as their guardian. The decree in favor of Lucy, who at the time of

its rendition was still under age, was rendered in the name of H. A. Garrett, who had been appointed her guardian *ad litem* for that purpose.

Executions were issued upon both decrees to the sheriff of Montgomery County, who also at the same time held some other executions against the same defendants, under which all the real estate belonging to the Barnetts and Micou were sold, and conveyed by the sheriff to Henry G. Semple, who was the attorney for Lucy B. and Clara E. and her husband, except one parcel bought in by one Pittman, plaintiff in one of the other executions, under an arrangement made with him by Semple on behalf of his clients. Each of the executions in favor of Mrs. Boykin and Lucy B. Micou was credited with $49,540.36 as the proceeds of these sales.

Executions were also issued upon the decrees to the sheriff of Macon County, where Benjamin H. Micou owned a plantation, which he cultivated, and on which, it is alleged, there was a large amount of personal property belonging to him, consisting of a crop of corn, cotton, grain, and plantation tools. The executions first issued to this county, it is charged, were returned without levy upon the personal property, under instructions from the plaintiffs to that effect, in order to enable Micou to dispose of it otherwise, which it is averred he did, and thereafter a levy was made on the real estate, which was sold and conveyed to Micou himself as trustee. These lands, it is charged, were worth $6,000, but were sold for $1,250.

Executions on the decree were likewise issued to Elmore County, under which real estate belonging to Micou, and also to the Barnetts, was sold to Semple. It is charged that there was a large amount of personal property belonging to the defendants on these lands, which was not levied on, in order that the defendants might convert it to their own use by some other disposition. And it is charged in the bill " that since the rendition of said decrees there has been a complete understanding and agreement between the parties to said executions that the plaintiffs therein should so use said decrees, and process to be issued thereunder, as to enable the defendants therein to hinder, defraud, and delay their several creditors, in that they were to be permitted and aided in converting property to

their own use," as therein shown; and that in further pursuance thereof, notwithstanding the sales of the real estate, the defendants in the executions have been permitted to remain in possession thereof for their own use.

The Barnetts were not made parties to the bill, and no relief is prayed against them.

It is also charged in the bill that Semple holds the legal title to the property conveyed to him under the sales on execution upon some secret trust, in which the Barnetts and Micou have, by agreement, some beneficial interest.

It is also alleged that, at the time of the settlement of the accounts in the Probate Court, Lucy B. was a minor over the age of nineteen years, but that her disability of nonage had been removed by a special proceeding for that purpose under a statute of Alabama; but these proceedings, a transcript of which is exhibited with the bill, show that the decree of the Chancery Court removing her disability was not rendered until June, 1874, although the petition therefor was filed in May, 1873; and, in point of fact, the settlement by Micou of his account as her guardian was made, as appears by the proceedings in the Probate Court, on his resignation of his guardianship, accepted of record on Jan. 26, 1874, and was effected by the appointment of Garrett as her guardian *ad litem,* in the matter of the settlement.

In his petition to the Chancery Court, praying for the removal of the disability of nonage in respect to Lucy, her father states as reasons for the relief, as follows: "Said minor is possessed in her own right of a considerable estate, real and personal, and a large part of said personal estate consists of demands against petitioner, which he is now ready and willing to settle and account for; said minor is a young lady of at least average intelligence and more than ordinary education and acquirements, and is, perhaps, as competent now to manage her own affairs as she ever will be. Your petitioner is at this time able and willing to settle all her demands against him. But inasmuch as he is engaged in commercial and manufacturing pursuits, and as the result of such pursuits is proverbially uncertain, petitioner may by adverse fortune be deprived of the means of making such full settlement after

said minor arrives at the age of twenty-one years; and peti-
tioner further states that Thomas M. Barnett and Nicholas D.
Barnett, the sureties of petitioner on his bond as guardian,
are engaged in the same pursuits as himself, and liable to
the same disaster," &c.

In point of fact, at and previous to that time Benjamin H.
Micou was, and had been, president and managing agent of the
Tallassee Manufacturing Company, No. 1, doing a large busi-
ness, with its office in Montgomery, Ala., and in which he and
the Barnetts were largely interested as the principal stockhold-
ers. The firm of Barnett, Micou, & Co. had in the fall of 1873
lent its credit to said manufacturing company, to the extent,
it is alleged, of $300,000, at which time, it is also alleged, that
company had become embarrassed, and in December, 1873,
suspended payment.

It is also charged that the firm of Barnett, Micou, & Co.,
and its individual members, were largely indebted on other
accounts, in excess of the value of their property, subject to
levy and sale under process, which it is alleged was not greater
than $175,000.

Clara E. Micou intermarried with Frank S. Boykin, July 10,
1873, shortly after which, it is alleged, and before the settle-
ment with her as guardian in the Probate Court, her father
transferred to her in payment of that sum, on account of what
was due to her from him, $30,000 in the capital stock of the
Tallassee Company, but omitted the same from his account in
the settlement, in pursuance of the fraudulent purpose already
charged.

Answers under oath are required from the defendants, and
numerous special interrogatories covering the whole scope of
the bill are addressed to them.

The account of Benjamin H. Micou, as guardian of his
daughters, as filed by him in the Probate Court for settlement,
Jan. 13, 1874, is exhibited with the bill. This account begins
with a balance to the debit of the guardian, as ascertained on
a former settlement by the Probate Court in 1859, which, with
interest, amounts to over $20,000, and includes cash items,
being amounts received for them, as distributees of the estates
of T. M. Barnett, Sen., their mother's father, and of the

estate of their mother, which, with interest, amount to about $70,000; and the other items consisting of sums received on account of the income arising from their property; but no income is allowed them for the years 1862, 1863, 1864, and 1865, on the ground that none was received; and the guardian charges himself with rent for their real estate from 1866 to 1873, rented by himself, at the rate of $1,000 per annum. The balance admitted by the guardian to be due to the two wards is $107,430.52.

That this account was rendered in good faith, and that there was due at the time from Benjamin H. Micou to his wards, at least, as much as the balance shown by it, are facts not questioned by the bill, but admitted — if not expressly, by necessary implication — to be true. · Indeed, the very fraud charged and relied on, as constituting the ground of the relief prayed for, is that the parties did not abide by this account.

It appears, however, by the transcript of the proceedings in the Probate Court, that Mrs. Clara E. Boykin, by her attorney, Elmore J. Fitzpatrick, objected to the allowance of certain items in the account as filed, and it is recited that " the court, having listened to the argument of counsel, and heard the testimony offered in support of the said objections, decided and ordered," that the guardian be charged with certain enumerated items. They consisted of amounts charged against him as hire of slaves for the years 1859 to 1865, both inclusive, and also rents for land during the same period, and surcharging the account for rents from 1866 to 1873, and readjusting the account in some other particulars, striking out the items of debit for proceeds of cotton, and disallowing certain items of credit. The final result was to credit the guardian with sums in the aggregate amounting to $22,261.98, and charge him with sums amounting to $92,553.95. The balance against him, after allowing for an error in making the addition, was thus increased in the sum of $76,291.08, making the final balance against him the sum of $185,967.60, of which, after deducting costs and commissions, Mrs. Boykin was entitled to one-half, being $88,300. For that amount judgment was rendered in her favor Feb. 10, 1874, with an order for an execution thereon against the guardian and his sureties.

The account of the guardian with his daughters was kept jointly, as their interests in the property had never been separated; and similar proceedings in the settlement with his daughter Lucy resulted, on Feb. 24, 1874, in a judgment for the sum of $88,031.77, in favor of Henry A. Garrett for her use, he having been appointed her guardian *ad litem*, to represent her in the settlement.

The accounts as originally filed by the guardian are based upon the principle of crediting the wards with the net proceeds of the operation of their plantations, carried on for them by their father, while the accounts, as settled by the Probate Court, charge him with the risks and losses of the business as carried on, requiring him to account as if he had rented the plantations and hired the slaves for his own use, at such sums as he might have obtained from others.

It seems not to be denied that the latter, under the laws of Alabama, was a proper mode and basis of settlement, unless the guardian could show some previous special authority for carrying on the operations of the plantation in the name and at the risk of his wards.

In the settlement of Micou's accounts it was claimed on his behalf, and as a justification of his account as filed by himself, that such special authority existed; and to prove this there was produced an order of the Probate Court of Tallapoosa County, dated July 18, 1859, which, it was claimed, contained such authority. It appears from a copy of that order, exhibited with the bill, that on Nov. 22, 1858, Benjamin H. Micou, as guardian of his daughters, filed a petition, setting forth that it was to the interest of said minors that the slaves belonging to them be kept together and worked on a plantation instead of hired out, and that for said purposes it was necessary to purchase a plantation on which to work said slaves, and to the interest of said minors so to do; suggesting that he had contracted for the purchase of a described tract for the purpose aforesaid, and praying for an order authorizing him to purchase and pay for the same. The probate judge accordingly appointed commissioners to report as to the value of the lands and the necessity of the purchase. On Dec. 20, 1858, another order was entered, reciting the report of the

commissioners in favor of the purchase for the purpose and at the price named; and "it appearing to the court from the report of said commissioners, and from legal and proper evidence, that it is to the interest of said minors that said slaves should be kept together and worked on a plantation, and that the purchase of the above-described plantation is a necessary one," &c., it was therefore "ordered, adjudged, and decreed by the court that the said Benjamin H. Micou do forthwith proceed and purchase said lands or plantation above described, at the price or sum aforesaid, for the use and benefit of the said minors," &c., and "it is further ordered that when said guardian shall have perfected said purchase, and received titles for said land, he report the same to this court."

On June 23, 1859, the guardian made report of the authorized purchase and of the payment of the price, and that a title had been made to the lands. This report was approved and confirmed by an order of the court, made July 18, 1859. But it does not appear that any further order was made by the court, directing or authorizing the guardian to keep the slaves of his wards together and work them on their plantation, at their risk and expense, instead of hiring them out and renting the lands. And the Probate Court decided, in the matter of the final settlement of his accounts, that the order to purchase the additional land, of Dec. 20, 1858, relied on as authority for so doing, did not have such effect; and the judge accordingly adjusted the account and found the balance due on the principle stated.

This judgment is attacked by the complainant below as collusive and fraudulent, and the right to the relief sought rests upon that charge.

The prayer of the bill is that the decrees of the Probate Court establishing these balances as due from Benjamin H. Micou, as guardian, to his daughters, respectively, together with all proceedings, executions, and sales under them of the property of Benjamin H. Micou, be declared to be null and void, and that the lands of Micou sold under them be subjected to the payment of the debt due to the complainant, and for general relief.

As required, the defendants answered severally, under oath,

and specifically deny every allegation of the bill charging fraud and conspiracy. These answers ·are supported by the testimony of the parties, taken on their own behalf in the cause.

The principal defendant, Benjamin H. Micou, in his answer, states that soon after his daughter Clara, afterwards Mrs. Boykin, became of age, " he commenced to make preparation for settling the whole of his account with his two daughters of his guardianship of their property, and in the spring of 1873 he collected up his accounts and vouchers in regard to his management of their estate and placed them in the hands of his attorney, David I. Blakey, and directed him to make out a full and correct account for settlement of said guardianship; and as he desired to be relieved of the responsibility of said trust entirely, and his other daughter, Lucy, was nearly of age, he, at the same time, instructed his said attorney to prepare a petition to the Chancery Court of Elmore County, praying to have said Lucy relieved from the disabilities of minority, so that he might settle at the same time with both of his said wards; that he failed to procure a decree at the June Term of said Chancery Court of Elmore County, and on account of bad health and absence from the city of Montgomery, and State of Alabama, during most of the summer of 1873, was unable to furnish his attorney with the information necessary from time to time to enable said attorney to properly prepare said account; the said settlement was further delayed by the breaking out of yellow fever in Montgomery in the fall of 1873 and by the financial panic, which occupied the whole of respondent's attention and compelled him to give the whole of his time to the management of the affairs of the Tallassee Manufacturing Company, to the exclusion of his private business, so that he was unable to take up the matter of the settlement of his guardianship until after his connection with the Tallassee Manufacturing Company ceased, in January, 1874, and that in making said settlements he did not consult or confer with said Clara or Frank Boykin or Lucy Micou, and did not give to his attorney any instructions to make out any different account from the one ordered to be made in the spring of 1873, when respondent believed himself to be a rich man and amply able to pay all his debts; and respondent is in-

formed by his said attorney, and believes and so states, that the account filed by him for settlement of his guardianship in the Probate Court of Tallapoosa County is substantially the same that was prepared by his said attorney in the summer of 1873."

This statement is inconsistent with the supposition that the settlement of his accounts as guardian was prompted by any belief in the imminency of his insolvency. And that it was not so is corroborated by the circumstances of a transaction charged in the bill as one of the evidences of the fraud alleged against him. It appears that about the time of the marriage of his daughter Clara, which occurred in July, 1873, he gave her certificates of shares of the capital stock of the Tallassee Manufacturing Company to the amount of $30,000, in payment of that amount of his indebtedness to her as her guardian. She gave a receipt for it at the time; but soon after, upon its being made known to her husband, and on the advice of counsel, the transaction was cancelled, as one that he could not insist upon. The omission to charge this as a payment in his account is alleged against him as proof of fraud. But if at this time he was aware of his own insolvency and that of the manufacturing company, the fraud attempted was against and not in favor of his daughter. No such uncharitable view of his conduct has been entertained in any quarter. The more reasonable and probable supposition is, that at the time he hoped to support his credit, preserve his business, save his property and pay his debts, and thus maintain the value of the property transferred to his daughter. The circumstances which induced the cancellation of the transaction altogether preclude the supposition of an intention to perpetrate a fraud upon the complainant.

Mr. Micou states further in his answer, "that at the time he filed his account for settlement in said Probate Court he did not think he was liable for the rents and negro hires afterwards charged against him, because he believed that an order had been made by the Probate Court of Tallapoosa directing said estate to be kept together, and so informed his attorney; and, therefore, his account was made out on the basis of charging himself only with the real profits derived from the cultiva-

tion of the plantation purchased for said wards, after deducting the plantation expenses and the expense of stocking said plantation with mules, utensils, and other stock; and respondent had no knowledge that any effort would be made to charge him with the said hires and rents until the question came up in the Probate Court of Tallapoosa County on the said settlement, when Elmore J. Fitzpatrick, representing the interest of said wards, contended that the order which defendant had always understood to be an order to keep the said wards' estate together, was in fact an order only to buy a plantation, and insisted on his right to charge defendant with rents and hires. Respondent's attorney, acting under his instructions, resisted said claim and argued the question of the proper interpretation of said order to the said Probate Court, but the court decided that respondent should be charged with rents and hires."

That this litigation was adverse and *bona fide* is testified to, also, by Blakey, the attorney for the guardian, and by Fitzpatrick, the attorney for the wards, and by Semple, the regular attorney of the latter, and for whom Fitzpatrick acted as a substitute on the occasion. They severally deny that there was any collusion or understanding or concert of any kind between them or with their clients in reference to the matter. If in point of fact there was any such collusive agreement, and a feigned contest in pursuance of it, these witnesses must have known it, for they were the instruments through whom alone, together with the judge, it was effectuated; and there is nothing in the case that warrants the alternative of rejecting their testimony as untrustworthy.

Some expressions in the deposition of Sturdevant, the probate judge, are referred to in argument as indicating that the contest before him was not earnest; such as that Blakey, the attorney for Micou, after a short argument in opposition to the contention of Fitzpatrick, "yielded the point;" but he distinctly and clearly states the issue between them, and the grounds of it. He says that "the whole question turned upon the fact that there was no authority given to Micou to keep the estate together and to run the farm;" that he decided that there was no such authority, and that the account was settled

upon that basis. There is no intimation that this judge was privy or party to the fraud charged against Micou, nor is it claimed that any fraud in procuring the judgment was practised by the parties or their attorneys upon him. A legitimate question was in fact submitted to him, and the responsibility of properly deciding it was distinctly imposed upon him by the law and the act of the parties. He rendered his decrees, and, we have no doubt, in perfect good faith; whether correctly or otherwise is not a question that can be made in this case. There is certainly nothing in their nature, nor in the estimate of values contained in them, to justify the inference that the judge was moved by any illegal or improper influences. Indeed, we are not referred by counsel to any principle or authority in the law of Alabama to show that, under the circumstances in proof before the Probate Court, the judge ought to have come to any different decision. But it is enough for the purposes of this case to find, as we do, that there was no fraud in the settlements and decrees on the part of either guardian or wards.

There being a failure of proof of the principal fact alleged — the *corpus delicti* — all the circumstances of suspicion that are arrayed as evidential lose their significance. That Micou was insolvent, and chose to prefer his daughters, to the extent to which they were his creditors, as his wards, and furnished them an opportunity, by means of a settlement made in good faith, and established by the decree of a competent court, to subject his individual property to their payment in preference to the complainant and other creditors of the partnership of which he was a member, may well be admitted to be sufficiently proven. But it is all that remains, and must be admitted at the same time to be fully sanctioned by the law of Alabama. The statute of that State, which is invoked as the ground of the relief prayed for in the bill, prescribes that "all conveyances or assignments, in writing or otherwise, of any estate or interest, in real or personal property, and every charge upon the same made with intent to hinder, delay, or defraud creditors, purchasers, or other persons of their lawful suits, damages, forfeitures, debts, or demands; and every bond or other evidence of debt given, suit commenced, decree, or judgment suffered with

a like intent, against the persons who are or may be so hindered, delayed, or defrauded, their heirs, personal representatives, and assigns, are void." Nevertheless, it is equally true, as it is expressly admitted in argument, that by the law of that State a debtor has the right to prefer one creditor over another, although such preference may leave the debtor without the means of paying his other debts. And thus conferring upon an insolvent debtor the right of absolute choice among his creditors, the law does not require one who is at the same time father and guardian to discriminate against his own flesh and blood, to whom he is indebted as their trustee.

Even the bankrupt law, which was then in force, and might have been invoked, for aught that appears in this record, by the complainant, to prevent the preference of which it complains, as a fraud upon it, assigns to the debt due from Micou to his daughters, as their guardian, a superior quality to that belonging to the claims of ordinary creditors; for his discharge in bankruptcy would not have released him from his legal obligation to his wards. And even had the distribution of his property, both that belonging to him individually and that of the partnership of Barnett, Micou, & Co., been made under proceedings in bankruptcy, the very preference secured to his daughters by the decrees of the Probate Court would, under the circumstances of the case, have still resulted. For in that case the individual property of the partners would have been first applied to pay in full all their individual debts; leaving to the partnership creditors, such as the present complainant, the partnership assets, and only the surplus of the individual property of the partners. This was precisely what took place under the proceedings in question.

It is alleged in the bill, and urged in argument, that after the decrees were obtained, the executions issued, which eventuated in the sales of real estate to Semple, were handled so as to hinder and obstruct other creditors in the collection of their debts, by covering crops and other personal property from levy and sale; but we have been unable to discover from the record any evidence in support of the charge; and the circumstance that the debtors, after the sales, were not turned promptly out of possession is not, in our opinion, any ground of complaint on

the part of other creditors, who show no right to distuib the sale itself. The same remark equally applies to the trust under which, by agreement with his clients, Semple holds the title acquired by the purchases under the executions. It appears from the answer of Mr. Semple, that, on April 4, 1874, after the decrees had been rendered against Micou, as guardian, and the Barnetts as his sureties, Clara and Francis Boykin, and Lucy Micou, assigned the same to Semple, with the right to control, manage, and collect them, upon trust, nevertheless, to proceed so as to secure to Clara and Lucy the title to certain described portions of the real and personal estate, to be sold under execution and purchased in by him to that end, and upon the further trust to purchase as much of the remainder of the property held and owned by the defendants in the decrees, respectively, as could be sold under said executions and purchased therewith, and to settle that part of it owned by Benjamin H. Micou, and sold as his, on his present wife and her children, and to settle that part of it so purchased, which may be sold as the property of Thomas H. Barnett, on his wife and children, and that sold as the property of N. D. Barnett, on his wife and children, but in the two last cases subject to certain charges specified for the payment of money to Clara and Lucy.

There is no proof whatever that it was in view of this or any similar arrangement that the settlements and decrees in the Probate Court were had, or that any such arrangement was then contemplated by any one of the parties. The contrary is proven by the oath of Mr. Semple, who testifies that it was purely voluntary on the part of Boykin, and his wife, and Lucy Micou, without any consideration from Benjamin H. Micou or the Barnetts, and suggested for the first time, and by himself, to them, after the decrees had been rendered, as a suitable thing to be done. The grounds on which he proceeded in his persuasions to his clients can best be told in his own words. He says : —

" After the rendition of the decrees I saw Francis Boykin and talked with him as a friend as well as his attorney ; his father and mother were old friends of my youth, and I had known him since he was a child. I told him that the whole

property of the guardian, Micou, and his sureties, Tom and Nich. Barnett, would not pay the debt; that they and their families would be left penniless; that it would be a hard course to pursue for him and his wife and Lucy to take everything they had, as by law they could do, and that common justice and common decency demanded that they should, out of the abundance which they would have, make some provision for the wives and families of their father and uncles. Boykin very readily agreed to this; but when it came to putting it in writing he seemed to place an exaggerated estimate on the value of the property, and place many difficulties in the way. I told him that it was apparent that the ruin of the Barnetts as co-partners in Barnett, Micou, & Co. had been caused by the faith, trust, and reliance they had placed in Micou, his wife's father; that neither he or his wife or her sister could ever enjoy the respect or confidence of the community if they did not make some proper provision for the families of Thomas M. and Nicholas Barnett, and as to their father's family, of course, I knew that nature itself would dictate a provision for them. I suggested to him that the whole property which we could reach by execution in fact came directly or indirectly from old Mr. Barnett, the grandfather of his wife and her sister, and how highly he had been esteemed for his sense of justice and honesty; that in my honest judgment he and his wife and her sister ought to consider what Mr. Barnett would do if he were alive and the owner of the property, and to do it. The young ladies were entirely willing to do whatever I recommended, and Mr. Boykin at last consented to make the provision I incorporated in the assignment, which is copied into my answer. The assignment was made to me as I refused to manage the matter in any other way. Miss Lucy was a minor, but I expected her disabilities of minority to be removed, and she engaged to ratify it when she became of age, which she afterwards did. Mr. Micou, so far as I know or believe, had no part in it and was not informed of it. He was not in town from the time I suggested it till it was executed. I never consulted him directly or indirectly about it, and have no reason to believe he was consulted by any one else on the subject. I never spoke to the Barnetts on the subject or any one else,

or suggested the arrangement, or any arrangement, for the assignment of the decrees, or for any provision to be made for the families of the Barnetts or of Micou, until after the decrees were rendered. In saying this I mean to state that I never even spoke to Boykin on the subject of any provision for the families of his wife's father or uncles until after the rendition of the decrees."

These motives were as honorable to him who urged them as to them who accepted and acted upon them; but, independent of their character, the important fact is that the arrangement was subsequent to the time when Mrs. Boykin and her sister had become absolutely entitled to subject all the property in question to the payment of their decrees, and entirely independent of the proceedings by which they obtained them; so that it clearly and satisfactorily appears that the decrees were not in fact rendered by consent and upon the agreement that such a benefit to the families of the debtors should result. This being so, the daughters of Benjamin H. Micou had a right to dispose of their own, free from question, so long as they infringed not the rights of others; and if they chose, in their turn, to pay a debt of gratitude to the brothers of their mother, and to ease the decline of an impoverished father, we know of no provision in the Code of Alabama which forbids it.

The court below proceeded upon a different view of the evidence, and rendered a decree granting the prayer of the bill. Its operation is to annul the settlements and decrees of the Probate Court of Tallapoosa County in favor of Mrs. Boykin and her sister, and all proceedings under them, and give priority to the complainant's judgment, without provision for securing them in the amounts admitted to be due them. It has been forcibly urged upon us in argument that, even upon the facts as charged in the bill, the decree would be erroneous in this respect, on the ground that the disability of coverture as to Mrs. Boykin, and of infancy as to Lucy Micou, and the circumstances of the fiduciary character of their relation to their father, rendered them, in law, incapable of active and responsible participation in an express fraud, so far at least as to exempt them from all liability, except to restore the actual fruits realized by them from it.

But we have not found it necessary to consider or decide that question, and it is mentioned merely to exclude all inferences that might otherwise arise.

In our opinion the evidence required that the decree below should have been in favor of the defendants, and for that error it must be reversed, and the cause remanded with instructions to dismiss the bill; and it is

*So ordered.*

MR. JUSTICE WOODS did not sit in this case, nor take any part in deciding it.