JOHN R. FREEMAN *vs.* CHARLES P. POOLE *et al.*

APRIL 14, 1915.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

*(1) Sales. Contracts. Auctions. Puffing.*

Where property is offered without reserve, by-bidding is illegal, and a vendor cannot hold the purchaser where the price has been run up by means thereof. In so far as this rule relates to the sale of goods by auction it is embodied in Gen. Laws, 1909, cap. 262, § 5.

*(2) Sales. Contracts. Auctions. Puffing.*

Gen. Laws, 1909, cap. 262, § 5, (2) provides "A sale by auction is complete when the auctioneer announces its completion by the fall of the hammer. Until such an announcement is made any bidder may retract his bid; and the auctioneer may withdraw the goods from sale unless the auction has been announced to be without reserve."

*Held*, that while not in terms referring to the sale of real estate no reason was apparent for not following the rule in such sales.

*(3) Sales. Contracts. Auctions. Puffing.*

Where real estate was offered at auction without notice of any reserve, a bid is but an offer to purchase and not the acceptance of an offer, and no contract exists until the hammer falls. Therefore where a *bona fide* bid was not accepted there was no contract and the knocking down of the property to the agent of the vendor on a higher bid must at least be given the effect of a withdrawal of the property from sale. It certainly negatives any intention to accept the lower *bona fide* bid.

BILL IN EQUITY. Heard on appeal of complainant from decree of Superior Court sustaining demurrer of respondent.

Appeal dismissed.

BAKER, J. This is a bill in equity for specific performance brought by John R. Freeman, of Providence, in this state, against Charles P. Poole, of Philadelphia, in the state of Pennsylvania, and John O. Brigham, of said Providence.

The bill alleges that said Poole, on the 27th day of September, 1913, was the owner of a certain tract of land in said Providence, described in the bill; that he by his agent Brigham offered said tract of land for sale at public auction without notice of any reserve; that through his agent Brigham he employed Frank J. Kinney, a public auctioneer, to conduct said auction sale; that the sale was advertised to take place on the premises on said 27th day of September, at twelve o'clock noon; that in accordance with said advertisement the auctioneer with the consent and under the direction of the defendant Poole offered said property for sale at public auction on the premises on said date to the highest bidder without reservation and called for bids for the same; that James H. Hurley, agent of the complainant, and others were bidders at said sale; that said Hurley made a bid in behalf of the complainant of sixteen cents per square foot on said tract of land represented by the auctioneer to contain 50,180 square feet; that the bid was recognized by the auctioneer and at the request of said Hurley was registered and written down by the auctioneer in his book; that another bid or other bids were made at said sale after said bid of sixteen cents; that the defendant John O. Brigham was present and acted as the agent of the owner, the defendant Poole, at said sale; and as such agent made a bid of nineteen cents a foot; that said tract of land was knocked down and declared sold by the auctioneer; that he entered in his book the name of John O. Brigham as purchaser, but that in fact the bid of John O. Brigham and all other bids made after the bid of sixteen cents per square foot were

fictitious bids made by the agents of the owner of said property; that complainant's bid of sixteen cents per square foot was the highest *bona fide* bid made at said auction sale and that a contract was thereby made and entered into by and between the complainant as the highest *bona fide* bidder and the defendant Poole by the terms of which the complainant agreed to buy of the defendant Poole and said Poole in consideration thereof agreed to sell said tract of land to the complainant for the sum of $8,028.80; that the complainant on the declaration of sale by the auctioneer then and there tendered him five per cent. of the purchase price as required by the terms of sale, which tender the auctioneer then and there refused to accept; that the terms of sale provided that a deed conveying said tract of land would be delivered to the purchaser at the office of the auctioneer on the 7th day of October, 1913, on the payment of the purchase price in cash on or before that day; that on said 7th day of October the complainant, at the auctioneer's office, tendered to the auctioneer as agent of the defendant Poole $8,028.80 in good legal tender, which moneys the auctioneer in behalf of said Poole refused to accept; that the complainant at the same time demanded a deed conveying said tract of land and that the auctioneer in behalf of said Poole refused to give a deed to the complainant.

The bill contains various other allegations unnecessary to be recited at the present time.

The death of John O. Brigham on November 7th, 1913, is suggested on the record.

The defendant Poole demurred to the bill and also filed a plea that the alleged contract was never reduced to writing or signed by him or by any person lawfully authorized by him so to do within the meaning of Section 6 of Chapter 283 of the General Laws of 1909. The grounds of demurrer are first, that it appears by the bill that no contract was ever made between the complainant and the respondent entitling the complainant to the relief prayed for; second, that the employing of puffing or by-bids did not operate to consum-

mate the contract between the complainant and the respondent where the former's bid was never accepted, so as to entitle the complainant to specific performance by the respondent; and third, that the employing of puffing or by-bids at an auction sale does not in itself entitle the complainant to specific performance by the respondent.

The case was heard in the Superior Court on the demurrer which was sustained. The case is here on complainant's appeal from the decision on the demurrer.

As this is a bill for the specific performance of a contract by the respondent Poole to sell the real estate in question to the complainant the precise question presented for consideration is whether or not the facts as stated in the bill show the existence of such a contract. This involves an inquiry into the nature of a sale at auction, both when and how at such sale the owner and the bidder effect and complete the contractual relation of vendor and vendee. The counsel for the complainant have with great thoroughness investigated and shown by English and American decisions the significance of by-bidding or puffing bids at auction sales as affecting the rights and liabilities of a purchaser at such sales, showing in the early decisions some difference in the effect as considered in law or equity, with the final general acceptance of the strict rule of the law courts that such bidding is illegal. It would serve no useful purpose to discuss this matter at length in the present case as the law in relation thereto is generally well settled.

(1)     The question was considered in *Hartwell* v. *Gurney*, 16 R. I. 78, where on page 79 the court says: "But, in our opinion, the rule, which is the more authoritatively established, is, that by-bidding is illegal, and that the vendor cannot hold the purchaser where the price has been run up by means thereof." That is the law in this state applicable to all cases where the owner has not at the sale announced his intention to bid. In so far as this rule relates to the "Sale of Goods" by auction it is now embodied in Section 5 of Chapter 262 of the General Laws of Rhode Island of 1909,

as follows: "Sec. 5. In the case of a sale by auction" . . . "(4) Where notice has not been given that a sale by auction is subject to a right to bid on behalf of the seller, it shall not be lawful for the seller to bid himself or to employ or induce any person to bid at such sale on his behalf, or for the auctioneer to employ or induce any person to bid at such sale on behalf of the seller or knowingly to take any bid from the seller or any person employed by him. Any sale contravening this rule may be treated as fraudulent by the buyer."

The claim of the complainant that a contractual relation between him and the respondent Poole exists, briefly stated seems to be that the offer to sell said land at auction without notice of any reserve was an offer to sell to the highest bidder; that his bid was the highest *bona fide* bid and as such an acceptance of the offer to sell making the contract complete; that the receiving of the higher puffing bids by the auctioneer and his knocking down the premises to one of these puffing bidders as purchaser did not affect the complainant's rights because of the fraudulent character of such bids and that the fall of the hammer was only significant of the fact that the auctioneer would wait for no further bids. In its lowest terms the question is this: Is a bid at an auction sale an offer or the acceptance of an offer? The complainant's claim is that his bid was the acceptance of an offer. The respondent's claim is that the bid was an offer not accepted by him.

There is some ground for complainant's claim, although he admits his inability to cite any case squarely upholding it. The case is apparently an unusual one. It is at least novel in the courts of this state. The claim seems to rest chiefly on dicta found in some cases suggesting and perhaps recognizing a theory never as yet directly applied in any case. Langdell seems to be the only one among text-writers holding this theory and his statement shows that it is what (in his opinion) the law *should* be rather than what it *is*, for after referring to the decision in *Payne* v. *Cave*, 3 T. R. 148 (to be considered herein later) that a bid at an auction is an

offer accepted by knocking down the hammer and suggesting that "perhaps it is too late to question the correctness of this decision" goes on to say in his summary at the end of volume 2 of his Cases on Contracts, on page 997: "On principle, however, it is open to much doubt. The true view seems rather to be, that the seller makes the offer when the article is put up, namely, to sell it to the highest bidder; and that, when a bid is made, there is an actual sale subject to the condition that no one else shall bid higher."

In *Bexwell* v. *Christie*, 1 Cowper, 395 (1776), the plaintiff brought an action on the case against an auctioneer to recover damages for selling a horse at auction for less than £7 contrary to plaintiff's directions "not to let it go under £15." The conditions of the sale were "that the goods should be sold to the best bidder." Held, that plaintiff could not recover. Lord Mansfield said in the course of the opinion: "What is the nature of a sale at auction? It is that the goods shall go to the highest real bidder. But there would be an end of that if the owner might privately bid upon his own goods." This is the first case to clearly announce the doctrine that by-bidding is a fraud on the public and will vitiate a sale.

But the complainant seems to rely largely upon *Warlow* v. *Harrison* (1859), 1 E. & E. 295, 309, as in his brief he says that in that case "the fundamental question was—did the plaintiff have any standing since the property was knocked down to another, that other being a fraudulent bidder?" As so much importance is given this case, it will be considered at length.

The facts in that case quite closely resemble those in this. The *Warlow* case was an action to recover damages for breach of contract. The facts differ in that in the *Warlow* case the sale was advertised to be "without reserve" while in the present case no announcement whatever as to reservation was made. The expressions in the bill "without notice of any reserve" and "offered . . . to the highest bidder without reservation" are construed by us to mean

that the owner gave no notice of the reservation of a right to bid and not as meaning that he announced that the sale would be "without reserve" or "to the highest bidder." This is the construction given by the parties in their argument.

In the English case the plaintiff bid 60 guineas and the owner, a Mr. Henderson, bid 61 guineas. Warlow being informed that the owner was the last bidder refused to bid again and the horse was knocked down to the owner. Warlow, claiming to be the highest *bona fide* bidder, tendered the amount of his bid to the auctioneer and demanded the horse. The auctioneer refused to receive the money or to deliver the horse, saying that he had knocked the horse down to the highest bidder. The plaintiff alleged that he was the highest bidder and that the defendant became and was his agent to complete the contract; that he had refused to do so and that in consequence the plaintiff had been deprived of the benefit of his contract and had incurred divers expenses. The defendant pleaded (1) not guilty; (2) that the plaintiff was not the highest bidder; (3) that defendant did not become plaintiff's agent. The plaintiff obtained a verdict but the Court of Queen's Bench ordered a nonsuit, on the ground that the issue as to the third plea had not been sustained by the plaintiff. Lord Campbell, C. J., in delivering the judgment of the court said: "The plaintiff's counsel argued that, as soon as the plaintiff had bid for the mare, the defendant, as auctioneer, became his agent to complete the contract for the purchase, and that the defendant was guilty of a breach of duty in failing to do so. This ingenious reasoning rests entirely upon the decision that, if, after an article put up to be sold by auction is knocked down to the highest bidder, the auctioneer at his request, signs a memorandum of the agreement to purchase, this is a sufficient memorandum of the agreement to bind the purchaser. But the auctioneer is the agent of the purchaser for this purpose only; and he becomes so only when there is a contract of sale by the acceptance of the bidding,

which is usually declared when the hammer is knocked down. Then the purchaser, or his representative, being present, authorizes the auctioneer to sign the memorandum. But, till the hammer goes down, the auctioneer is exclusively the agent of the vendor. *Mr. Spooner* contended that from the commencement of a sale by auction the auctioneer is in the situation of a broker or middleman between the vendor and the purchasers, as the common agent of both; that he is the agent of the bidder to receive the bidding; that the bidder is a conditional purchaser; that, where the sale by the conditions is without reserve, the bidder is absolutely the purchaser unless there be a *bona fide* higher bidding; and that the auctioneer, in consideration of the bidding by which the commission will come to him, promises the highest bidder to knock down the article to him, and to do all that is necessary to complete the sale. But this reasoning is wholly at variance with the case of *Payne* v. *Cave*, which has been considered good law for nearly seventy years. That case decided that a bidding at an auction, instead of being a conditional purchase, is a mere offer; that the auctioneer is the agent of the vendor; that the assent of both parties is necessary to the contract; that this assent is signified by knocking down the hammer; and that, till then, either party may retract. This is quite inconsistent with the notion of a conditional purchase by a bidding, and with the notion of there being any personal promise by the auctioneer to the bidder that the bidding of an intending purchaser shall absolutely be accepted by the vendor. The vendor himself and the bidder being respectively free till the hammer is knocked down, the auctioneer cannot possibly be previously bound. At this auction, the mare never was knocked down to the plaintiff; and the relation of principal and agent between him and the defendant never had commenced." The court stated that it was not called upon to say whether there was any "remedy on the conditions of the sale against the vendor who violates the condition that the article shall be *bona fide* sold without reserve; but we are clear that the

bidder has no remedy against the auctioneer, whose authority to accept the offer of the bidder has been determined by the vendor before the hammer has been knocked down." In the Court of Exchequer Chambers upon appeal it was held that upon the pleading the judgment of the Court of Queen's Bench was right and that the defendant was entitled to the verdict upon the issue on the third plea, viz.: that he had never become the plaintiff's agent. The judgment of the court, delivered by Martin, B., speaking for himself and Byles, J., and Watson, B., after suggesting that the Court of Appeal could allow amendment in order "to determine the real question in controversy between the parties in the existing suit" was, in part, as follows: "Upon the facts of the case, it seems to us that the plaintiff is entitled to recover. In a sale by auction there are three parties, viz.; the owner of the property to be sold, the auctioneer, and the portion of the public who attend to bid, which of course includes the highest bidder. In this, as in most cases of sales by auction, the owner's name was not disclosed: he was a concealed principal. The name of the auctioneers, of whom the defendant was one, alone was published; and the sale was announced by them to be 'without reserve.' This, according to all the cases, both at law and equity, means that neither the vendor nor any person in his behalf shall bid at the auction, and that the property shall be sold to the highest bidder, whether the sum bid be equivalent to the real value or not; *Thornett* v. *Haines*, 15 M. & W. 367. We cannot distinguish the case of an auctioneer putting up property for sale upon such a condition from the case of the loser of property offering a reward, or that of a railway company publishing a time table stating the times when, and the places to which, the trains run. It has been decided that the person giving the information advertised for, or a passenger taking a ticket, may sue as upon a contract with him; *Denton* v. *Great Northern Railway Company*, 5 E. & B. 860. Upon the same principle, it seems to us that the highest *bona fide* bidder at an auction may sue the auctioneer as

32

upon a contract that the sale shall be without reserve.    We think the auctioneer who puts the property up for sale upon such a condition pledges himself that the sale shall be without reserve; or, in other words, contracts that it shall be so; and that this contract is made with the highest *bona fide* bidder; and, in case of a breach of it, that he has a right of action against the auctioneer.    The case is not at all affected by the 17th section of the Statute of Frauds, which relates only to direct sales, and not to contracts relating to or connected with them.    Neither does it seem to us material whether the owner, or person on his behalf, bid with the knowledge or privity of the auctioneer.    We think the auctioneer has contracted that the sale shall be without reserve; and that the contract is broken upon a bid being made by or on behalf of the owner, whether it be during the time when the property is under the hammer, or it be the last bid upon which the article is knocked down; in either case the sale is not 'without reserve,' and the contract of the auctioneer is broken.    We entertain no doubt that the owner may at any time before the contract is legally complete, interfere and revoke the auctioneer's authority.''    .   .   .
''Mr. Henderson could not be the buyer; he was the owner; and, if it were material, there is ample evidence that the defendant knew him to be so:    indeed we think he ought not to have taken his bid, but to have refused it; stating, as his reason, that the sale was 'without reserve.'    We feel inclined to differ with the view of the Court of Queen's Bench in this, that we rather think the bid of Mr. Henderson was not a revocation of the defendant's authority as auctioneer.''    ·

Willes, J., and Bramwell, B., did not dissent from the judgment, but rested their decision ''as to the amendment upon the ground that the defendant undertook to have, and yet there was evidence that he had not, authority to sell 'without reserve.' ''

Section 17 of the Statute of Frauds referred to is as follows: ''Sec. 17.    No contract for the sale of any goods, wares or merchandise for the price of £10 sterling or upwards, shall

be allowed to be good, except the buyer shall accept part of the goods so sold, and actually receive the same, or give something in earnest to bind the bargain, or in part payment, or that some note or memorandum in writing of said bargain be made and signed by the parties to be charged by such contract or their agents thereunto lawfully authorized."

As already stated, the Warlow case is in many respects quite similar to the present one. In both there is a highest *bona fide* bidder. In each case the owner made a higher bid and the property was knocked down to him. In each the *bona fide* bidder made tender of the amount of his bid in accordance with the announced terms of sale and demanded a completion of the sale and in each case there was a refusal so to do. In the English case the bidder sued the auctioneer because as his agent he had not completed the contract or sale, thereby causing him damage. Had the auctioneer in that case knocked down the horse to the bidder in addition to being the agent of the vendor he would then also have become the agent of the purchaser for the purpose of signing the memorandum required to bind the purchaser. The Queen's Bench, as already appears, holding that the assent of both vendor and purchaser is necessary to the contract and that assent at an auction sale is signified by knocking down the hammer decided that, as the horse was not knocked down to the plaintiff, the relation of principal and agent between him and the auctioneer never commenced. This must mean that the plaintiff never became a purchaser and that there was no sale of the horse to him. The Court of Exchequer Chamber affirmed the judgment that the auctioneer did not become the plaintiff's agent and in no respect dissented from the view expressed by the Queen's Bench in following the case of *Payne* v. *Cave* as to the relation of vendor, auctioneer and bidder at an auction sale. It did dissent from the judgment of Queen's Bench in two particulars: the latter court had signified that the final bid of the vendor had determined the authority of the auctioneer to accept the offer of the bidder as to which the Court of Exchequer said: "We

rather think the bid of Mr. Henderson was not a revocation of the defendant's authority as auctioneer." The second point of dissent is this: The Queen's Bench indicated,,that there was no foundation for the "notion of there being any personal promise by the auctioneer to the bidder that the bidding of an intending purchaser shall absolutely be accepted by the vendor," as to which the Court of Appeal held that "the auctioneer who puts the property up for sale upon such a condition pledges himself that the sale shall be without reserve, or, in other words, contracts that it shall be so and that this contract is made with the highest *bona fide* bidder; and, in case of a breach of it that he has a right of action against the auctioneer," at the same time pointing out that such a contract is one *relating to or connected with sales contracts* and accordingly not affected by the 17th section of the Statute of Frauds "which relates only to direct sales." In the *Warlow* case it was held that upon amendment the action to recover damages would lie because there had been no sale though it had been promised "without reserve," the right of action for breach of contract arising out of the last two words. In other words, the action is not based on the theory that there was a sale, but that there was no sale, in consequence whereof there was a breach of a contract made by the auctioneer at the start of the auction sale announced to be "without reserve" with the person who should prove to be the highest *bona fide* bidder at such sale. The support afforded the complainant by what was decided in the case of *Warlow* v. *Harrison* is not readily apparent.

The other English cases cited by complainant seem to lend no substantial aid to his claim.

In *Harris* v. *Nickerson*, L. R. 8 Q. B. 286 (1873), the plaintiff brought an action against an auctioneer to recover damages consisting of expenses and loss of time in attending an auction to purchase goods advertised to be sold, but not actually put up, which case was apparently an attempt to extend the application of *Warlow* v. *Harrison* so far as to hold that an auctioneer in advertising an intention to hold

an auction sale created a binding contract between those who acted upon such notice and attended the sale for the purpose of buying. It was held that such an action was not maintainable.

In *Johnston* v. *Boyes*, L. R. (1899), 2 Ch. 73, the defendant advertised real estate at auction under the condition that the highest bidder should be the purchaser and that the deposit to be paid at the sale should be cash. The plaintiff sent her husband to bid for her. The property was knocked down to him. He offered a check which the auctioneer refused. The property was sold to someone else. She sued for breach of contract, that the highest bidder should be the purchaser. There was judgment for the defendant on the ground that the conditions of sale had not been complied with by the purchaser. This was accompanied by a statement of one of the judges that had the bidder tendered the deposit in cash and then been refused the property he would have had a right of action, citing *Warlow* v. *Harrison*.

In *McManus* v. *Fortescue*, L. R. (1907), 2 K. B. 1, it was held at a sale by auction subject to reserve price on the article sold where the fact that there was a reserve was known, that the offer of the auctioneer to sell, the bidding and the knocking down of the article to the highest bidder are all subject to the condition that the reserve price should be reached. The lot was actually knocked down to plaintiff, but the auctioneer refused to sign a memorandum of sale or to receive a deposit. The action was brought against him for breach of contract. It was held that there could be no recovery because the lots were offered for sale subject to a reserve price and if the bid at which the lot was knocked down was less than the reserve price there was no authority on the part of the auctioneer to complete the sale, the case being distinguished from *Warlow* v. *Harrison*, in that in the latter the offer to sell was "without reserve" and in the former with a reserve.

The complainant also cited three American decisions as tending to support his claim. The first is *Hinde* v. *Pendleton*

*et al.,* Wythe 354 (1791), Va. Plaintiff had bought five slaves at auction to be paid for in tobacco. There was by-bidding and the final bid of the plaintiff was very large, to secure the payment of which he gave bond with surety. The defendants recovered a judgment against the plaintiff for the tobacco shown to be due by the bond. The plaintiff filed a bill to enjoin the defendant from collecting their judgment on the ground 'that on account of by-bidding he ought not to be charged by the bond with more than the true value of the slaves. Apparently one of the defendants suggested that the sale be set aside as the court says: "The sale ought not to be set aside entirely as the active defendant proposed, although the last price bidden by the plaintiff above a true bidder cannot be now discovered because this uncertainty was occasioned by the defendant's agent and by-bidder; but the sale ought to be effectual upon payment of so much tobacco as is equal to the value of the slaves at the time of the sale." The cause was referred to commissioners to ascertain the value of the slaves at the time of the sale and the injunction was made perpetual as to so much of the judgment as should be in excess of the finding of the commissioners as to the value of the slaves. The point decided in *Payne* v. *Cave, supra,* was not involved or suggested in this case. The slaves had been knocked down to plaintiff. He did not seek to rescind the sale, but asked relief from the fraud resulting from the by-bidding.

*Veazie* v. *Williams*, 3 Story, 611 (1845), and *Veazie* v. *Williams*, 8 How. (U. S.) 134 (1850), was a bill in equity to rescind the purchase of real estate with mill privileges on account of puffing bids. The purchase was made at an auction sale in 1836 and the price was run up to $40,000 by puffing bids. The purchaser did not learn of the by-bidding until 1840. In 1841 he filed his bill. In the Circuit Court, Story, J., held the plaintiff not entitled to relief. Ware, District Judge, held otherwise. In the course of his opinion he said: "When goods are offered for sale at auction the plain and only meaning of the offer is that they shall go to

the highest bidder. There is an implied guarantee to every man who bids that he shall have the property if no one bids more." He then suggests that an owner may protect himself by putting up his property at a minimum price or by giving notice of his intention to bid at the sale, and adds: "But if nothing of this kind is done the only intelligible interpretation that can be given to the act, and it is language held out to all the world, is that he who will give most shall have the property." It was in evidence that since the sale property of the kind in question in the locality had greatly depreciated in value and that the highest *bona fide* bid unaffected by puffing bids was about $20,000. The conclusion at which Judge Ware arrived was expressed as follows: "The conclusion to which I have come on the whole is that a decree allowing the sale to stand and cutting down the price to about and perhaps a little over $20,000 will do substantial justice between parties. It leaves to the defendants all the advantages of the sale under the most favorable circumstances which they can justly claim, and takes from the plaintiff only what others were willing to give." Upon appeal the Supreme Court in 8 How. 134, 159, by a divided court, reached the conclusion that the most equitable course would be "to treat as unjust only so much of the proceedings as was fraudulent; that is, the excess of price over $20,000 obtained by by-bidding, and to cause that excess only to be refunded," and it decreed accordingly giving relief similar to that afforded in the preceding case, although that case was not cited. In considering the effect of by-bidding, the court, on page 154, says: "The by-bidding deceives and involves a falsehood, and is, therefore, bad. It violates, too, a leading condition of the contract of sales at auction, which is that the articles shall be knocked off to the highest real bidder, without puffing." This is suggestive of the view expressed in *Warlow* v. *Harrison, supra.* It is to be borne in mind also that in the Veazie case the property was actually knocked off to the plaintiff which was not done in the present case.

*Towle* v. *Leavitt*, 23 N. H. 360 (1851), was an action of replevin for the recovery of a carriage. Plaintiff owned the carriage which he sent to a carriage maker for repair, at the same time authorizing the latter to sell it at a minimum price of forty dollars. Carriages of the carriage maker were advertised at auction and at the auction sale, without the knowledge of the owner, the carriage maker put up the carriage in question. It was knocked down by the auctioneer to the defendant for seventeen dollars and the sale was duly entered by the clerk of the sale. The defendant paid the clerk, receiving a receipted bill and also took possession of the carriage. It was in evidence that the carriage maker had employed a person named Ricker to bid on the carriage with instructions not to let it be sold under forty dollars. Ricker testified that he bid seventeen dollars and heard no other person bid that sum; that when he heard the carriage struck off at his bid he left the place of sale without noticing to whom the sale was declared by the auctioneer to be made, and that he supposed the sale to be made to himself. The principal dispute was whether the defendant or Ricker was the highest bidder at the sale. The only part of the charge of the court below applicable to the facts above stated is as follows: "That though the defendant and Ricker both bid the same sum upon the property and the auctioneer did not notice Ricker's bid and declared the property sold to the defendant and the same was entered to the defendant in the record of sale and no objection was made thereto because Ricker supposed it struck off to himself and the defendant paid for the property, yet he acquired no title to it by such bid unless he was in fact the highest bidder." The court also charged that, if Ricker acting for the owner made a higher bid than the defendant at the auction, the defendant would acquire no title even if the property was struck off to him by the auctioneer and "that the highest bidder alone could be the purchaser, and although he were a by-bidder an actual *bona fide* bidder of a lower sum, could take no title." As the case is stated there is no

evidence that Ricker made a higher bid than the defendant and therefore this portion of the charge seems irrelevant to any issue. To be relevant it would at least have to appear that there was a question as to defendant's having bid seventeen dollars. The upper court construed the effect of by-bidding, discussing the cases in considerable detail and also the distinction made in the law and equity courts, concluding as to this point as follows: "The line of distinction which is attempted to be drawn in equity between a fair and fraudulent sale, where secret puffing, or by-bidding is resorted to appears to us to be difficult to trace. We think it will be far better to discard the distinction entirely, and thereby close the door to all temptation to fraud at auction sales, and the perjury that would be very likely to follow. The whole and real truth should be stated when the property is offered for sale. Upon this point of the case, the instructions of the court must be held to be erroneous." It is difficult to determine what portion or portions of the charge are held to be erroneous and consequently also the value of that case as an authority in the present one. The case was actually decided in favor of the plaintiff on the ground that the carriage maker was without authority to sell at auction.

In *McAlpine* v. *Young*, 2 Ch. Chambers Rep. 171 Ontario, there was a judicial sale. On page 173 the chancellor says: "When the bidding ceases, the person who had made the highest bid is under the general orders of the court the purchaser; and neither the vendor nor the auctioneer nor any one else can interfere and deprive him of his position."

The complainant in his brief says: "In this country today auction sales under judicial authority appear to be considered as more or less in a class by themselves," and he lays no stress on the last case as an authority, although it is the only case cited which in terms upholds his claim. There are two lines of cases on this point as to judicial sales, which are brought together in *Anderson* v. *Wisconsin Central*

*Railway Co.*, 107 Minn. 296, in which it is stated that "The decided weight of authority is" against the doctrine announced in *McAlpine* v. *Young, supra.*    Leaving this last case out of the account it is difficult to see how the other cases cited afford any material support for the complainant's claim in the present case that a contract for the sale of land was complete between the respondent and himself.   The most that can be said is that some of these cited cases contain dicta which, given the broadest interpretation of which the language is susceptible, can be held to imply that the highest *bona fide* bidder at an auction sale *ought* to be held to be the purchaser irrespective of anything else.   As already pointed out, aside from some decisions as to judicial sales the view is without authoritative support.   The law has so long been definitely settled otherwise that to use Professor Langdell's language (with the omission of the qualifying word "perhaps") "It is too late to question its correctness."   Williston (who drew the Uniform Sales Act hereinafter referred to) in his work on Sales in considering the "Formation of Contract at Auctions" says in Section 296, "As an original question it is fairly open to argument whether the auctioneer by offering goods for sale makes an offer which ripens into a contract or sale when the highest bidder accepts the offer, or whether putting up the goods for sale is merely an invitation to those present to make offers, which they do by making bids, one of which is ultimately accepted by the fall of the hammer.   Under the first view each bid would amount to an acceptance of the offer and a completion of the contract subject to the condition subsequent that no higher bid should be made.   On the second view each bid is an offer and the contract becomes complete only when the hammer falls.   The latter view seems more in accordance with the facts, as the auctioneer may more accurately be said to invite offers than himself to be the offerer, and the law has adopted this doctrine.   It follows that the bidder may retract the bid at any time before the hammer falls, for until then the contract is incomplete.

If the contract is incomplete so far as the bidder is concerned, it must also be incomplete so far as the auctioneer is concerned. Consequently the auctioneer, unless he has announced that the sale shall be without reserve  .  .  .  , may withdraw the goods from sale at any time before the hammer falls."

The leading case as to the relation in an auction sale of the seller and the bidder is *Payne* v. *Cave, supra* (1789). That was an action to recover damages for breach of contract. The plaintiff had offered for sale at an auction a worm tub and a pewter worm in the same. The defendant bid forty pounds. The auctioneer dwelt on the bidding on which the defendant said: "Why do you dwell? You will not get more." The auctioneer said he was informed the worm weighed at least 1300 cwt. and was worth more than forty pounds. The defendant then asked if he would warrant its weight and receiving a negative answer then declared that he would not take it and refused to pay for it. It was resold on a later day for thirty pounds. The action was to recover the difference of ten pounds. The plaintiff was nonsuited. The court affirmed the nonsuit, saying: "The auctioneer is the agent of the vendor, and the assent of both parties is necessary to make the contract binding; that is signified on the part of the seller by knocking down the hammer, which was not done here until the defendant had retracted. An auction is not unaptly called *locus poenitentiæ*. Every bidding is nothing more than an offer on one side, which is not binding on either side till it is assented to. But according to what is now contended for, one party would be bound by the offer and the other not, which can never be allowed." This case is cited with approval in *Jones* v. *Nanney*, 13 Price's Rep. 76, 96, in *Routledge* v. *Grant*, 4 Bing. 655, 660, and in other English cases. Campbell, C. J., in *Warlow* v. *Harrison, supra*, in 1858, said that this case "has been considered good law for nearly seventy years." And see *Fenwick* v. *Macdonald*, F. & Co. 6 Session Cases 850 (1904). No English case is

cited as overruling *Payne* v. *Cave.* In fact the English Sale of Goods Act, 1893, accepts the rule and embodies it in Section 58, (2) where it states: "A sale by auction is complete when the auctioneer announces its completion by the fall of the hammer or in other customary manner. Until such announcement is made any bidder may retract his bid." This act applies of course only to the sale of personal property, but the nature and effect of bidding at public auction has never been held to be affected by the character of the property sold, whether real estate or personal property.

In *Blossom* v. *R. R. Co.,* 3 Wall. 196, the Supreme Court says this as to the effect of bidding at auction: "4. Biddings at an auction, says Mr. Addison, are mere offers, which may be retracted at any time before the hammer is down and the offer has been accepted. Leading case upon that subject is that of *Payne* v. *Cave,* where it was expressly held that every bidding at an auction is nothing more than an offer on one side until it has received the assent of the auctioneer as the agent of the owner. Supreme Court of Pennsylvania held, in the case of *Fisher* v. *Seltzer,* 23 Pa. 62, that a bidder at a sheriff's sale has a right to retract his bid before the property is struck down to him, and that the sheriff has no right to prescribe conditions which will deprive him of such a right. Express ruling was that a bid at an auction before the hammer falls is like an offer before acceptance, and that when the bid is withdrawn before it is accepted there is no contract, and that such a bidder cannot be regarded in any sense as a purchaser. Rule, as laid down in the last edition of 'Story on Sales,' is substantially the same as that adopted in the preceding case. Speaking of ordinary sales at an auction, the author says that the seller may withdraw the goods or the bidder may retract his bid at any time before they are struck off, and the reason assigned for the rule is, that so long as the final consent of both parties is not signified by the blow of the hammer there is no mutual agreement to a definite proposition. But as soon as the hammer is struck down, says the same author, the bargain

is considered as concluded, and the seller has no right afterwards to accept a higher bid nor the buyer to withdraw from the contract. Same rules prevail upon a sale under common law process as in other cases of sales at public auction, so far as respects the question now before the court. Until the property is actually struck off to the bidder he may withdraw his bid as a mere offer or proposition." See, also, *Corryolles* v. *Mossy*, 2 La. 504; *Newman* v. *Vonderheide*, 9 Ohio Dec. Reprint 164; *Grotenkemper* v. *Achtermeyer*, 11 Bush (Ky.), 222; *Hibernia Savings & Loan Society* v. *Behnke*, 121 Cal. 339; *Fisher* v. *Seltzer*, 23 Pa. 62; *Dunham* v. *Hartman*, 153 Mo. 625; *Thomas* v. *Kerr*, 96 Am. Dec. note p. 265; Bateman on Auctions *30, *126; 2 Kent's Com. 424; *Tillman* v. *Dunman*, 114 Ga. 406, 57 L. R. A. 784; *McPherson Bros. Co.* v. *Okanogan Co.*, 45 Wash. 285 (1907); 4 Cyc. 1044; Benjamin on Sales, 6th Am. Ed. pp. 422, 423; 3 Am. & Eng. Ency. L. 501; Page on Contracts, Sec. 33; 2 R. C. L. 1126; *Anderson* v. *Wis. Ry. Co.* 107 Minn. 296; 20 L. R. A. (N. S.) 1133.

In *Newman* v. *Vonderheide, supra*, it is said that "where property offered at public auction for sale is withdrawn before the acceptance of a bid there is no contract of sale and the highest bidder cannot compel a conveyance by an action for specific performance." In *McPherson Bros. Co.* v. *Okanogan County, supra*, the defendant advertised real estate for sale at public auction to the highest bidder for cash. When the property was offered for sale as advertised the plaintiff made a bid which was the only and highest bid. The county treasurer refused to accept it and to knock down the property to the plaintiff, and on subsequent tender of the sum bid refused to accept it and to convey the property. In a proceeding for specific performance the court held that there was "no contract of sale between the parties," and "no contract capable of being specifically performed." In *Anderson* v. *Wis. Ry. Co., supra* (1907), which was an action for damages for not selling to the plaintiff as the alleged highest bidder at an auction sale certain

real estate, the question considered in this case was very carefully examined and thoroughly discussed. Referring to the view herein pressed by the complainant, the court, on page 313, states the case thus: "It is in fact utterly irreconcilable with principles which are universally recognized. Mutuality is an essential element of a contract. One party thereto cannot be bound and the other remain free. If the announcement of an auctioneer is the offer to sell to the highest good faith bidder and the contract is closed when the bid is made, both the vendor and the vendee must be bound thereby. But it is conceded by all the authorities that the bidder may withdraw his bid at any time before the hammer falls and this means necessarily that the bid is a mere offer and is not binding until accepted;" and on page 314: "A bid is an offer which is accepted when the hammer falls; and until the acceptance of the bid is signified in some manner neither party assumes any legal obligation to the other. At any time before the highest bid is accepted, the bidder may withdraw his offer to purchase, or the auctioneer his offer to sell."

*Hartwell* v. *Gurney, supra,* is suggested as giving support to the complainant's view, where the court, on page 80, said: "An offer to sell at auction is an offer to sell to the highest bidder, and every bid is an inchoate acceptance, entitling the bidder to the property offered, if it turns out to be the highest, and there is no retraction on either side before the hammer falls." Leaving out the last clause the quotation may be taken to lend support to complainant's claim, but the last clause destroys that support, for that clause clearly indicates that both owner and bidder may retract before the hammer falls and that neither one of them is contractually bound until it does fall. The passage is dictum and apparently is not stated with the clearness and precision ordinarily so characteristic of the learned justice who wrote the opinion. The seeming contradiction in the language would disappear by substituting the words "a possible purchase" for "an inchoate acceptance" and thus

read the passage would be in accord with the prevailing authorities.

(2) But the whole matter of whether a bid at an auction is an offer capable of being withdrawn before the fall of the hammer or is the acceptance of an offer binding owner and bidder to a contract is definitely settled so far as personal property is concerned by Section 5 of Chapter 262 of the Gen. Laws of 1909. This is a portion of the Uniform Sales Law enacted in this and many other states which is similar in its provisions to the Sale of Goods Act of England. Said Section 5 provides, among other things, as follows: "(2) A sale by auction is complete when the auctioneer announces its completion by the fall of the hammer, or in other customary manner. Until such an announcement is made any bidder may retract his bid; and the auctioneer may withdraw the goods from sale unless the auction has been announced to be without reserve."

As already pointed out there is no inherent or necessary difference in the manner of conducting auction sales as affected by the character of the property sold, whether it be real or personal. Of course an act governing only the sale of goods would not in its terms refer to the sale of real estate, but as these uniform acts are attempts to embody in legislation what has already been generally declared to be the law by the courts no good reason is apparent for refusing to follow in all auction sales a rule thus sanctioned. Applying the rule (2) above quoted it is plain that the complainant in this case was at liberty at any time before the hammer fell to withdraw his bid; that the auctioneer, as agent of the respondent, was likewise at liberty to withdraw the land from sale inasmuch as the auction had not been announced to be (3) without reserve. In other words, the statute recognizes a bid as an offer and not as the acceptance of an offer and clearly implies that no contract exists until the hammer falls. Undoubtedly this rule in the absence of an express announcement that the sale is to be without reserve does permit an owner to "put up property merely 'to feel the public

pulse' and see if he can get a better price than he can at private sale," as complainant states and criticises in his brief. The knocking down of property on the highest bid made by Brigham as the agent of the owner must at least be given the effect of a withdrawal of the property from sale. It certainly negatives any intention to accept complainant's bid. The honorable and straightforward course would have been to make an open withdrawal if the highest *bona fide* bid were not satisfactory to the owner; but inasmuch as it appears that the owner was not bound contractually to the bidder up to the fall of the hammer we are unable to understand how that event coupled with the auctioneer's announcement of the sale of the property to another person for a higher price can possibly be construed to be an acceptance of a lower *bona fide* bid and the completion of a sale to the lower bidder. We do not think it was such an acceptance. It is our judgment that the bill fails to show the existence of a contract of sale by the respondent to the complainant and that the decision of the Presiding Justice of the Superior Court in sustaining the demurrer was correct.

The appeal of the complainant is dismissed, the decree of the Superior Court appealed from is affirmed and the cause is remanded to the Superior Court for further proceedings.

*George Hurley, Tillinghast & Collins*, for complainant.
*William R. Tillinghast*, of counsel.
*Edward C. Stiness, Aylsworth Brown*, for respondent.