Vander W. **FORBES**

v.

**WELLS BEACH CASINO, INC.**

and

**Elias M. Loew.**

Supreme Judicial Court of Maine.

June 28, 1973.

J. Armand Gendron, Sanford, for plaintiff.

Preti & Flaherty, by John J. Flaherty, Robert E. Burns, Portland, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY and ARCHIBALD, JJ.

WEATHERBEE, Justice.

The Plaintiff brought an action in the York County Superior Court for specific performance of an alleged contract between him and the Defendant, Wells Beach Casino, Inc., for the sale of certain real estate and personal property of the Defendant and for other incidental relief. A Justice in the Superior Court dismissed Plaintiff's complaint and supplemental pleadings for failure to state a claim upon which relief can be granted. M.R.C.P., Rule 12(b). We sustain Plaintiff's appeal. The pleadings and exhibits—all taken as true for the purposes of this appeal—authorize the following summary of facts:

In early 1960 Elias M. Loew and Lawrence G. Laskey each owned 50% of the capital stock of Wells Beach Casino, Inc. which owned and had operated real estate housing a dance hall, bowling alleys and other facilities. Laskey was President and a Director and Loew was Treasurer and a Director. The business relationship of Loew and Laskey had become less than harmonious and in July of 1960 Laskey filed a complaint against the Corporation, Loew and another (not of interest here) charging corporate mismanagement, asking (among other things) appointment of a receiver for the corporation and for its

dissolution.[1] After two hearings had taken place on Laskey's complaint on September 13 and October 3, 1960 the matter was continued[2] and on October 6, 1960 Laskey and Loew sought to resolve the disposal of the corporate property and the division of its assets, out of court, by means of the contract which forms the basis of the present action. The contract which was executed by Laskey and Loew on that date is as follows:

"AGREEMENT made this sixth day of October, 1960, by and between ELIAS M. LOEW, (hereinafter called 'Loew'), and LAWRENCE LASKEY, (hereinafter called 'Laskey') each being fifty per cent (50%) stockholders of WELLS BEACH CASINO, INC., (hereinafter called 'Corporation') a Maine corporation.

Whereas Loew and Laskey wish to terminate their business relationship in the Corporation they hereby contract and agree, for valuable considerations, as follows:

1. Within seven (7) days from this day Loew and Laskey shall each appoint one appraiser. Within seven days (7) thereafter, the two appraisers so selected shall choose a third appraiser. The three appraisers shall within thirty days (30) from this date appraise and determine the fair value of all the real and personal property owned by the Corporation at Wells, Maine. The Board of three appraisers shall act by majority vote.

2. The board then shall at once list said property with one or more real estate brokers in order to secure binding offers for the sale and purchase of said property. Any broker recommended by either Loew or Laskey shall be retained by the board to list said property.

3. Within one hundred twenty (120) days after this date and after reports from the brokers the highest cash offer which is equal to, or in excess of, the value so set by the board and which the board determines to constitute a reasonable offer under the circumstances shall be accepted and the property shall be sold in accordance with this offer and acceptance.

4. All expenses arising from the procedures herein shall be paid by the Corporation.

5. After the sale, the Corporation shall be fully liquidated; prior to liquidation there shall be no corporate disbursements, stock transfers or other activity of any nature or description except for ordinary maintenance and except that the parties shall complete all corporate matters necessary to carry out the foregoing provisions.

6. This agreement is binding upon the parties hereto and their respective heirs, executors, administrators and assigns.

(signed) Lawrence G. Laskey (seal)
(signed) Elias M. Loew (seal)

Three real estate brokers were named as appraisers. They determined the fair value of the corporation's property to be $28,834.00, listed the property for sale and solicited binding offers.

The brokers failed to sell the property by the usual methods and, by a supplemental agreement, Loew and Laskey agreed

1. The business estrangement between Loew and Laskey is not unfamiliar to this Court. In Laskey and Finn v. L. & L. Manchester Drive-in, Inc. & Laskey & Finn v. L. & L. Brewer Drive-in, Inc., Me., 216 A.2d 310, 315 (1966), in which Laskey sought dissolution of the two corporations and alleged that they were deadlocked in their management, we found that "a study of the record discloses such acrimony between the factions that there is loss of communication and no signs of reconcilability."

2. It was still pending when the present action was commenced on December 20, 1963 and was dismissed under Rule 4(b) (1) on November 15, 1968.

that each of them could, if he wished, submit a single sealed bid for the property without deposit and that their bids, if any, and the sealed bids of other persons were to be opened on February 6, 1961 and the highest bid was to be certified by the appraisers and the property was to be sold to the highest bidder.

On February 6, 1961 the appraisers met and opened the only sealed bids received. It was then revealed that Laskey's bid was $45,000.00 for the property free and clear of encumbrances, without deposit. The Plaintiff's bid was for $39,100.00 and was accompanied by a certified check for $1,000.00. Loew's bid was for $35,000.00 subject to "the outstanding lease on the Variety Store",[3] without deposit.

The Plaintiff alleges that the bids of Laskey and Loew were not made in good faith and are, therefore, null and void and of no legal effect and that he, the Plaintiff was the highest good faith bidder. The sale of the property to the highest good faith bidder has never been completed. Plaintiff has demanded title and one of the appraisers still holds Plaintiff's $1,000 deposit.

The Plaintiff asked that specific performance of their contract to convey the Corporation property to Plaintiff be ordered of the Corporation, Laskey and Loew and that the purported lease to Moritz Loew be declared null and void, or if valid, that it should be ordered assigned to the Plaintiff.

Elias Loew's motion to dismiss for want of personal jurisdiction over him was reported to this Court and on May 11, 1966 we held that the "long arm" statute gave the Court personal jurisdiction. Forbes v. Wells Beach Casino, Inc., Me., 219 A.2d 542 (1966).

In the meantime, tax lien mortgage certificates had been recorded against the property for unpaid real estate taxes and the Corporation's equity of redemption expired. On April 11, 1966 the Town brought a civil action to establish and confirm its title to the premises.

On April 11, 1968 Elias M. Loew, individually, paid all taxes, interest and costs due on the property to the Town and the Town gave him, individually, a deed to the property, with some exceptions and reservations.

Plaintiff filed a supplemental pleading alleging these facts and that Loew's taking title individually was a fraud on all parties in interest and especially the Plaintiff and asking that Loew be held to hold the property as a constructive trustee for all interested parties and especially for the Plaintiff, subject to Plaintiff's demands for specific performance.

Laskey was defaulted and a default judgment issued against him in 1969. On May 29, 1970 Plaintiff acquired from Laskey four shares and from one Mintz one share of the Corporation stock and thus became the owner of 50% of all the shares of capital stock of the Corporation issued and outstanding.

On February 23, 1971 the Plaintiff voluntarily dismissed as to Moritz Loew,[4] leaving only the Corporation and Elias M. Loew remaining as Defendants.

On the same day Plaintiff filed a second supplemental pleading alleging his acquisition of 50% of the ownership of the Corporation, that Elias M. Loew owns the oth-

3. Plaintiff alleges that on January 5, 1961 there was recorded for the first time a fraudulent lease dated November, 1958 (day of month missing) allegedly given by the corporation to Moritz Loew for a period of 10 years and 5 months of part of the Casino building, the existence of which lease had not been disclosed to either Plaintiff or Laskey although the call for bids by the appraisers called for the sale of the property free and clear of all encumbrances.

4. Moritz Loew's interest—if any—under the 10-year 6-month lease had now expired.

er 5 shares of the Corporation, that Loew's failure in his duty as Treasurer to pay the corporate taxes and his taking title to the property in himself, individually, constituted a fraud on the Corporation and on Plaintiff's shares. Plaintiff further alleged that Loew paid for the property only a minor fraction of its fair value and that, by permitting title to pass to the Town and by accepting a deed with reservations and exceptions, Loew and the Corporation have placed themselves in a position where they cannot convey to Plaintiff the entire property and so should respond to the Plaintiff in damages for the difference between the fair market value of the property not subject to the reservations and that subject to the reservations.

Plaintiff repeated his request that Loew be declared a constructive trustee subject to Plaintiff's demand for specific performance and for damages. He also alleged that the corporation is deadlocked in its management and that there is no possibility of agreement between Plaintiff and Loew over the management, that his attempts to obtain redress through Loew have failed and he asks that the Corporation be dissolved, that receivers be appointed to wind up the Corporation affairs, to convey the property in question to the Plaintiff and to distribute the corporate assets.

The Corporation and Loew moved to dismiss the *second supplemental pleading*. The Single Justice who acted upon this motion treated it as a motion to dismiss the complaint and the two supplemental pleadings. At argument the parties have adopted this treatment and we will do the same.

The Single Justice held that the complaint and supplemental pleadings failed to state a claim upon which relief can be granted and ordered the complaint and supplemental pleadings dismissed.

Plaintiff's appeal raises only this question—do the complaint and supplemental pleadings allege facts which if presented in evidence and accepted by the trier of the facts would entitle Plaintiff to relief on any one or more of the three theories which he presents?

In our opinion the Plaintiff has made allegations which entitle him to present his proof.

### The Contract.

Plaintiff's claim as to this issue may be summarized in this manner. He urges us that he has alleged facts from which, with the correct application of established principles of law, it may be found that:

1) Loew and Laskey made an agreement on October 6, 1960 to sell the Corporation property to the highest bidder who offered an amount equal to or in excess of the appraised value.

2) As conventional sales methods failed to produce a bidder it was agreed that sealed bids would be accepted and the property sold to the highest bidder.

3) Three bids were received—Laskey's, the Plaintiff's and Loew's, in that order as to size of bid.

4) The bids of Loew and Laskey were not made in good faith and, therefore, the Plaintiff was the highest bona fide bidder.

5) The contract of Loew and Laskey was for the sale of real estate (with some personal property included only as an incident to the real estate) and is therefore enforceable by the purchaser.

6) Although the contract does not name Plaintiff as a party, it was made partially for the benefit, as third parties, of the bidders and especially the Plaintiff and thus the Plaintiff has standing to enforce it.

### Interpretation of the Agreement.

Was the agreement between Loew and Laskey an unconditional contract to sell to the highest cash bid equal to or in excess of the fair market value of the property as

determined by the appraisers? Or was it simply an agreement for the solicitation of offers?

The Defendants' position as to this is that Loew and Laskey's agreement was merely a declaration of intention to sell to the highest bidder and was not an offer which could be accepted by Plaintiff's bid. The Defendants' position was accepted by the Single Justice in the Superior Court who found that the written contract of October 6, 1960 and the supplemental agreement as to sale by sealed bids contemplated only the reception of offers to purchase and that Plaintiff's offer was never accepted.

■ A manifestation of mutual assent, express or implied, is essential to the formation of a contract. Belfast & Moosehead Lake Ry. v. Inhabitants of Unity, 62 Me. 148 (1871). A declaration of intention to enter into an agreement upon stated terms at some time in the future is not an offer which can be accepted. Restatement, Contracts, § 27 (1932). If the agreement of Loew and Laskey was merely a declaration of intent to sell, the property could be withdrawn from sale at any time before the seller accepts. 1 Williston On Contracts § 27 (3rd ed. 1957).

The paramount rule in the construction of contracts is that the intention of the parties shall be gathered from the language of the agreement viewed in the light of the circumstances under which it was made unless a rule of law or policy forbids. Bell v. Jordan, 102 Me. 67, 65 A. 759 (1906); Gray v. Richards, 120 Me. 183, 113 A. 9 (1921).

We must analyze the language used by the contracting parties to determine whether the procedure which Loew and Laskey chose to achieve a dissolution of their disagreeable relationship was intended as a solicitation of offers which would require the mutual acceptance of the two estranged associates or whether it was intended as a device which would result in a sale to the highest qualified bidder.

The fact that the contract speaks of authority to the brokers to secure "offers" certainly argues that what was intended was only a solicitation of offers that might or might not be accepted by the Corporation. On the other hand, the offers which are to be solicited are *"binding* offers for the *sale* and *purchase"*. (Emphasis added.)

The contract provides that the highest qualified cash offer *"shall* be accepted" (emphasis added) which indicates a renouncement by the two associates of further discretion in the choice of the purchaser.

The conditions which the written agreement states submitted bids must meet in order to be qualified offers are that they must be for cash and for an amount equal to or in excess of the fair value of the property set by the Board and be determined by the Board to be a reasonable offer under the circumstances. Whatever significance the latter condition was to have during the original 120-day period during which the Board was to attempt to find a purchaser for the property by conventional sales methods disappeared when the supplemental agreement was made that the property would be sold by means of sealed bids. We read in these agreements no indication of intent to give the Board a discretion to arbitrarily reject the highest sealed offer equal to or in excess of the Board's own determination of fair value.

■ The contract's use of the words "offer" and "acceptance" is not necessarily determinative of the issue. We must find the parties' intent from the whole contract. Towne v. Larson, 142 Me. 301, 51 A.2d 51 (1947). Looking at the substance of the contract rather than to the form alone (Neely v. Havana Electric Ry., 136 Me. 352, 10 A.2d 358 (1940)), we find that an unmistakable purpose of finality is disclosed. We find the pleadings and exhibits

—undisputed for the purposes of our decision—reveal Loew and Laskey's clear intention to terminate their business relationship, sell the corporate property to the highest bidder and fully liquidate the Corporation. It is unmistakable that they have chosen to substitute this agreed sale for the judicial dissolution which might have resulted from the pending legal action. We conclude that the contract was intended to preclude further controversy between the parties and not to be only a prelude to further litigation.

We construe the execution of the agreement as intended to put into motion an irrevocable procedure for the sale of the corporate property and to exclude any opportunity for one or the other party to sabotage the proceedings. It was intended that the highest bidder (whose bid was equal to or in excess of the fair value) should receive a conveyance from the Corporation and Loew and Laskey, the sole owners of the Corporation, bound themselves to the carrying out of this intention.

Strong evidence of Loew and Laskey's intention to deny one another the power to prevent the sale to the person making the highest cash offer is their supplementary agreement that either or each of them may submit his own bid. The obvious futility of either one's submitting a bid which in fact required acceptance by the other disagreeing 50% owner argues against any other interpretation than that both the maker of the "highest cash offer" and the persons who offered the property for sale were to be bound.

Professor Corbin has commented upon the situation in which personal property may be offered for sale in such a manner that the purchaser's bid becomes an acceptance and consummates the sale.

"It is quite possible, of course, for the seller to make an operative offer to sell his goods, either singly or in gross. *If he offers to sell an article at a specified price, he is not engaging in an auction sale*; this is true whether his offer is made to a single person, or to a group of persons then present, or by a published notice to many persons not identified. Any offeree has power to accept such an offer, as long as he has no reason to know that the offer has been withdrawn. The circumstances may be such that the first effective acceptance terminates the power of all other offerees.

*It is equally possible for a seller to make an operative offer to sell his goods without specifying a price,* although such offers are not very common. He can empower the offeree to fix the price as part of the acceptance. By such an acceptance the sale is consummated; *but it is not an auction sale*." (Emphasis supplied.) A. Corbin, Contracts § 108 (1963).

We find this reasoning persuasive and are convinced that the principle may appropriately be applied to offers of sale of real property as well.

We consider that Loew and Laskey bound themselves to cause the Corporation to go through the necessary legal mechanics to carry out the sale to the person who made the highest qualified cash offer.

We think the Single Justice was in error when he ruled that the agreement, as supplemented, between Loew and Laskey contemplated only a solicitation for offers which would require acceptance by the Board.

*Was Plaintiff's bid the highest qualified cash offer?*

We construe the words "highest cash offer" to mean the highest *good faith* cash offer. Laskey's bid was higher than that of the Plaintiff but Plaintiff alleges (and it is undisputed and conclusive for the purposes of our decision) that the bids of both Loew and Laskey were not good faith bids and that, therefore, his bid is the highest good faith cash offer.

*When the highest bidder for purchase of real estate is not a good faith bidder, is the second highest bidder, if in good faith, entitled to purchase the property?*

This issue has not been before our Court until the present case and there is little precedent in the country. What precedent there is appears of small assistance. Several other courts, under different circumstances, have declined to extend relief to a bidder who was not the highest bidder. The Single Justice drew from them some analogy to our present situation. In Freeman v. Poole, 37 R.I. 489, 93 A. 786 (1915) the Court found no contract in the second highest bidder at an auction of real estate even though the highest bid was that of the seller who had no right to bid. However, the Rhode Island statute as to auctions of personal property[5] effective at that time provided that until the auctioneer announces the completion of the sale by the fall of the hammer, the goods may be withdrawn from sale unless the auction has been announced to be without reserve.[6] The Rhode Island Court found no necessary difference between auction sales of real or personal property and applied the same principle, holding that the sale to the second highest bidder had not been completed before the property was withdrawn from sale.

In Brewer v. Cowan, 220 La. 189, 56 So.2d 149 (1951) the Court declined to grant the second highest bidder's petition that the adjudication of sale of real estate to the highest bidder be revoked and that he be substituted as the highest bidder because of the fact that the highest bidder (the City) had failed to pay the purchase price within the required time. While the Court found that the principle that the property goes to the second highest bidder if the highest bidder's bid is invalid to be an unprecedented approach, its denial of the request seems to be based upon the fact that the Civil Code gave only the *seller* the right to ask to set aside an adjudicated sale.

In Drew v. John Deere Co. of Syracuse, Inc., 19 A.D.2d 308, 241 N.Y.S.2d 267 (1963) the Defendant assignee of a conditional sales contract on a repossessed tractor was the highest bidder at the auction. The Plaintiff was the next highest bidder. The Appellate Division, New York Supreme Court held that an announcement that the sale would be made to the highest bidder is not the equivalent of an announcement that the auction would be "without reserve" and that in an auction not expressly announced to be "without reserve" the owner may withdraw the property at any time before it is actually "knocked down" by the auctioneer.

The Court added, as dicta,

"We thus are brought back to the original point that the plaintiff's case depends upon a showing that the auction was one 'without reserve'. It is only in that type of auction that he could claim to be entitled to the purchase of the property at the amount bid by him, if his bid was the highest bona fide bid and was improperly topped by a bid by the owner (Restatement of Contracts, § 27, Illustration No. 4)."[7] Drew v. John

5. General Laws of Rhode Island, 1909, ch. 262, § 5.

6. ". . . The words 'without reserve' as used in auctions are words of art, as showing prospective bidders that the property will actually go to the bidder offering the highest price, and the seller may not nullify this purpose by bidding himself or through an agent, or by withdrawing the property from sale if he is not pleased with the bids." 7 Am.Jur. 2d Auctions and Auctioneers, § 21.

". . . In an auction with reserve the auctioneer may withdraw the goods at any time until he announces completion of the sale. In an auction without reserve, after the auctioneer calls for bids on an article or lot, that article or lot cannot be withdrawn unless no bid is made within a reasonable time. . . ." 11 M.R.S.A. § 2–328(3).

7. The Court described an auction "without reserve" as being one in which ". . . the owner of the property has

Deere Co. of Syracuse, Inc., supra, 19 A.D.2d at 312, 241 N.Y.S.2d at 271.

In Zuhak v. Rose, 264 Wis. 286, 58 N. W.2d 693 (1953) an auction sale of real estate was announced to be "without reserve" and the Court held that that had the effect of an agreement that the property would actually go to the bidder offering the highest price. The Court said that the seller could not nullify this purpose by bidding himself or by withdrawing the property from sale if he is not pleased with the bids. This would be the effect of auction sales of personal property under the Uniform Sales Act and the Wisconsin Court found that the same rule should be applied judicially to auction sales of real property.

The holdings of the courts which decline to declare the highest good faith bidder to be entitled to the purchase of the property when the seller has made a higher, but bad faith, bid appear to be based upon the rationale that in a sale in which the seller has reserved the right to bid, a fraudulent bid by the seller is only an exercise of his right to withdraw the property from sale or a refusal to accept the bona fide next highest offer.

This rationale is inappropriate for application to our own situation because, although Loew and Laskey were entitled to bid, their written and supplemental agreements, as we construe them, denied them the right either to withdraw the property from sale after the sealed bids had been received or to refuse to accept Plaintiff's offer. Although the words "without reserve" were not used in the public announcements of the sale, the effect of their agreements with each other was to entitle the highest good-faith bidder of $28,834 or in excess thereof to a sale of the property.

Although no rule has been declared in Maine as to the right of the highest good-faith bidder at a sale of real estate to take the property when a higher bid is proved not to be a good-faith bid, such a principle has been clearly stated concerning bad-faith bids of the seller at auction sales of personal property. Our Uniform Commercial Code, 11 M.R.S.A. § 2–328(4) reads:

"(4) If the auctioneer knowingly receives a bid on the seller's behalf or the seller makes or procures such a bid, and notice has not been given that liberty for such bidding is reserved, the buyer may at his option avoid the sale or take the goods at the price of the last good faith bid prior to the completion of the sale. This subsection shall not apply to any bid at a forced sale."

While the present sale was not a sale at auction we do not find the differences significant in a consideration of the rights of a highest good-faith bidder when there has been a higher fraudulent bid. Neither do we see any distinction which would militate against the application of the principle declared by the Uniform Commercial Code to sales of real estate. See Zuhak v. Rose, supra. We believe, as did the Rhode Island Court,[8] that the Uniform Acts represent efforts to embody into legislation accepted principles of judicial decisions, and we consider the principle announced by the Code eminently applicable to protect the rights of the highest good-faith bidder in a sale of real estate by single sealed bids when the property was agreed to be sold to the highest bidder, especially when the higher bids were made by persons who were, when we look behind the corporate facade, the sellers. We believe that the same principles of equity and fairness

no right to withdraw the property after bidding has commenced." Drew v. John Deere Co. of Syracuse, Inc., supra, 19 A.D.2d at 310, 241 N.Y.S.2d at 269. The Court said, additionally, "It is also necessarily implicit in an auction 'without reserve', that the owner of the property may not himself bid in the property, as this would be equivalent to withdrawing it from sale . . . .". Id.

8. Freeman v. Poole, supra.

which the Code recognized as controlling against fraudulent bids in the seller's behalf in auctions of personal property should apply here and that if the Plaintiff can demonstrate that Laskey's higher bid was not bona fide, then Plaintiff is entitled to purchase the property.

*Does the Plaintiff have standing to enforce the contract?*

The contract was one for the purchase of real estate—except for some personal property incidental to the buildings—and our Court had adopted the generally accepted principle that a contract for the sale of real estate is specifically enforceable. Handy v. Rice, 98 Me. 504, 57 A. 847 (1904); Dunham v. Hogan, 143 Me. 142, 56 A.2d 550 (1948); 49 Am.Jur. Specific Performance § 92; 81 C.J.S. Specific Performance § 63. In Maine, as in most American jurisdictions, a third person may sue in his own name to enforce a contract which was made for his benefit even though he was not a party to the contract and no consideration moved from him. Hinkley v. Fowler, 15 Me. 285 (1839); Frothingham v. Maxim, 127 Me. 58, 141 A. 99 (1928); Verrill v. Weinstein, 135 Me. 126, 190 A. 634 (1937); 17 Am.Jur.2d, Contracts § 302.

The Restatement of Contracts, § 133(1)(a) describes one of the third parties included under the American rule as a donee beneficiary and defines his status in this manner:

"(1) Where performance of a promise in a contract will benefit a person other than the promisee, that person is, except as stated in Subsection (3):

(a) a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise of *all or part* of the performance thereof is to make a gift to the beneficiary *or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary.*" (Emphasis supplied.)

While the agreement between Loew and Laskey was primarily for their benefit, the benefit to the Plaintiff was more than incidental. The agreement contemplated that other persons were to have the right to submit sealed bids and that the highest qualified bidder was to receive a conveyance of the property by the promisee. Loew and Laskey were each both promisor and promisee, each being entitled to insist upon performance by the other. In order to accomplish their own mutual purposes, they intended to confer upon the highest bona fide bidder a right to performance of their agreement to sell. Each promised to "cause the corporation to carry out the terms of their personal agreement". Forbes v. Wells Beach Casino, Me., supra. It is not necessary that the contract be exclusively for Plaintiff's benefit—or that it was made primarily for his benefit; he has standing to enforce it if he is a member of a class of beneficiaries entitled to some performance under the contract. 17 Am.Jur.2d, Contracts §§ 306, 307; 17A C.J.S. Contracts, § 519(4) a.

While the early Maine cases which established the rights of the third party beneficiary were actions in assumpsit and this Court has not been called upon to approve of equitable type relief to the non-contracting beneficiary, we find nothing in our decisions tending to confine its use to the law side. Particularly in view of the merger here of law and equity and our recognition of one form of civil action there appears to us to be no justification for denying, as such, equitable type of relief to the beneficiary who is entitled to enforce the contract. Shaw v. E. I. Du-Pont De Nemours & Co., 124 Vt. 304, 204 A.2d 159 (1964); 17 Am.Jur.2d, Contracts § 319; 17A C.J.S. Contracts § 523(1) f.

Such is the rule recommended by the Restatement of Contracts, § 138:

"§ 138. Allowance of Specific Performance. If specific enforcement of a duty owed to a donee beneficiary or to a creditor beneficiary is possible and in accordance with the rules of equity, a suit for such enforcement can be maintained. The suit may be brought either by the promisee or by the beneficiary."

■ Quite apart from the analogy that can be drawn from the rule statutorily established as to auction sales of personal property, the standing of the Plaintiff as the alleged highest bona fide bidder is supported by application of the principle of equitable estoppel. Our Court has frequently interposed this doctrine to prevent the injustice which would result if a party's own fraud could create a situation which would defeat another's just claim. Hallowell National Bank v. Marston, 85 Me. 488, 27 A. 529 (1893); Caswell v. Fuller, 77 Me. 105 (1885).

Here, Loew and Laskey agreed that the property would be sold to the highest good-faith bidder. If, as Plaintiff has alleged, each submitted a fraudulent bid, while Plaintiff's bid was made in good faith, the Defendants cannot now contend successfully that Laskey's fraudulent bid prevents Plaintiff's good-faith bid from being the highest qualified bid.

The Single Justice rejected Plaintiff's contention that Loew's purchase of the corporation property in his own name was an abuse of his fiduciary position and that he should be declared to hold the corporation property as a constructive trustee for the benefit of all interested parties and especially for the Plaintiff. The Justice concluded that any right Plaintiff might have to relief under this theory must be based upon 1) his standing as a person entitled to purchase the property, and/or 2) his right as the now owner of the Laskey stock to seek relief as upon a stockholder's derivative action for the benefit of the Corporation.

The Justice's conclusion that Plaintiff was not entitled to purchase the property —which we have found to have been error —led him to disregard the first basis for that particular equitable relief. We consider that it, alone, would entitle Plaintiff to such equitable relief.

*The Plaintiff's supplemental claim for derivative relief.*

The Justice also rejected the second ground. He noted that Plaintiff alleged Loew's taking the title to the property in his own name in his first supplemental pleading which was filed October 3, 1969; that Plaintiff was not a stockholder at the time of Loew's alleged mismanagement of corporate property; that in his second supplemental pleading Plaintiff alleges he bought Laskey's stock on May 29, 1970; that therefore (being charged with knowledge of all facts well pleaded) Plaintiff is held to have known of the alleged wrong of Loew as an officer dealing with corporate property at the time he purchased Laskey's stock. The Justice inferred that Plaintiff acquired stock in the corporation for the purpose of gaining standing, if possible, to bring a stockholders derivative action. The Justice concluded that the correct governing principle applicable to such a situation, absent a controlling statute or rule of court, is that

"the Court should not and will not under ordinary circumstances lend its aid to such litigation of a purchased grievance and a stockholder situated as is this plaintiff in this case has no standing to bring a derivative action."

■ The derivative action is distinguished from an individual's action which is brought by a stockholder for a loss separate and distinct from that suffered by the other stockholders. The right of a stockholder to sue on behalf of a corporation to protect or restore the assets of the corporation from *ultra vires* actions and other acts of mismanagement developed in equity. In theory the action is one to protect the corporation itself against acts from

which its management is unwilling or unable to protect it. The wrong complained of is one to the corporation and the shareholder is a nominal plaintiff. Ulmer v. Maine Real Estate Co., 93 Me. 324, 45 A. 40 (1899). With the proliferation and increased complexity of problems of stockholder-management relationship the principle has become extended and refined and is covered by statute and rule in many jurisdictions. Experience has taught us that this exercise of the stockholder's right frequently results in preventing corrupt or careless managerial dissipation of corporate assets and that it has the effect of elevating corporate morality. On the other hand, it has also resulted in some abuses of the right and in the bringing of "strike suits" with grim prospects of expensive and time consuming litigation which are finally settled for nuisance value. We know that even a deluge of meritorious actions might overwhelm the corporation and stifle its operating capacity to the loss of all the shareholders. Koster v. (American) Lumbermens Mutual Casualty Co., 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1946); Note, "Extortionate Corporate Litigation: The Strike Suit", 34 Colum.L.Rev., 1308, N. 1 (1934).

A principal cause for concern in the application of the principle of derivative right of action has been the question of whether a stockholder has standing to bring a derivative action to remedy a wrong which occurred prior to his acquisition of his shares of stock. There is conflict on this issue with the majority favoring the rule that to entitle a minority stockholder to attack a wrongful transaction it must appear that he was a stockholder at the time of the commission of the act complained of (or that his shares of stock have devolved upon him since by operation of law.) Jepsen v. Peterson, 69 S.D. 388, 10 N.W.2d 749, 148 A.L.R. 1087 (1943); Sorin v. Shahmoon Industries, Inc., 30 Misc.2d 408 and 429, 220 N.Y.S.2d 760 (1961); Annotation 32 A.L.R.2d 854, § 3; 69 A.L.R.2d 569, § 4 [a]; 19 Am.Jur.

2d, Corporations § 564; 18 C.J.S. Corporations § 518. Ownership of stock contemporary with the occurrence of the wrong is necessary for standing under the Federal Rules of Civil Procedure. F.R.C.P. 23(b). It is proposed as a requirement under the American Bar Association—American Law Institute Model Business Corporation Act, § 43A.

The philosophy of the courts pro and con is discussed in a frequently quoted opinion by the late Dean Roscoe Pound, written while he was Commissioner for the Supreme Court of Nebraska. Home Fire Ins. Co. v. Barber, 67 Neb. 644, 93 N.W. 1024, 1028–1031 (1903). The Nebraska Court was convinced that a bystander should not be entitled to purchase a grievance against the Corporation. Equitable principles would be offended, the Court said, by a situation in which the owner of stock who consented to or participated in acts of bad management might subsequently sell his shares to a purchaser who then made a profit by contesting these very acts. The Court's decision was based upon the theory that the purchaser of stock buys only the vendor's present interest in the corporation and its assets and not any cause of action which his vendor may have had. This later view, it is said by the Courts holding to this position, is supported by the rationale that the stockholders had the option to complain or to acquiesce in the mismanagement and as they have tacitly exercised this option by inaction the option is not capable of being later transferred. Besides, the Court said, except where mismanagement continues or affects him specially or peculiarly in some manner the subsequent purchaser should take things as he found them.

Equitable principles have been invoked to bar the standing of a subsequent purchaser who has bought stock with knowledge of the wrongs of which he complains. Bateson v. Magna Oil Corp., 414 F.2d 128 (5th Cir. 1969). Some courts have applied the principle of estoppel where the vendor of the subsequent purchaser participated in

or consented to the wrongs later the subject of complaint. Matthews v. Headley Chocolate Co., 130 Md. 523, 100 A. 645 (1917); Annotation 16 A.L.R.2d 497, § 8.

A substantial minority of jurisdictions take the view that the right to sue for past wrongs is a corporate asset and that the subsequent purchaser acquires all the rights of the person from whom he bought the stock, including the right to bring a derivative action for past mismanagement. Just v. Idaho Canal & Improvement Co., 16 Idaho 639, 102 P. 381 (1909); Continental Securities Co. v. Belmont, 206 N.Y. 7, 99 N.E. 138 (1912).

Some doubt has been expressed as to the position of our own Court on this issue. 1 Field, McKusick and Wroth, Maine Civil Practice § 23.3 at 393 (2d ed. 1970). Hyams v. Old Dominion Co., 113 Me. 294, 93 A. 747 (1915) presented a complaint of mismanagement which was not significantly different from our own problem. Defendant company was a Maine holding company which in fact owned shares of a New Jersey corporation that had never been transferred to the Defendant company but were actually held in the names of two of its directors. The two directors persisted in keeping the record title to the stock in their own names as individuals without any formal authority to do so from either the Board of Directors or the stockholders. Although the majority stockholders were informed of the irregular situation, the record did not indicate that the predecessors in title of the Plaintiff—a subsequent purchaser of stock in the Defendant corporation—were aware of the mismanagement. Plaintiff's bill in equity sought to secure record legal title to the property in the Defendant corporation.

It was urged in defense, in part, that the Plaintiff cannot complain because the wrong, if any, was done before the Plaintiff became a stockholder. The Court on appeal disposed of this argument without extended analysis of the principle with which we, too, are concerned saying only:

"One answer to this, and a sufficient one, is that the wrong is a continuing one. If there was a wrong before the Plaintiff became a stockholder it is no less a wrong since. It is an existing condition, alleged to be a corporate wrong, that he complains of."

We realize that the "continuing wrong" theory has been criticized (Pergament v. Frazer, 93 F.Supp. 9, 12 (D.C.Mich.1949); Weinhaus v. Gale, 237 F.2d 197 (7th Cir. 1956)) and that, in a sense, all unrectified wrongs done to a corporation's financial stability are "continuing" as, theoretically, at least, the corporation will continue indefinitely to be X dollars poorer than it would have been if mismanagement had not cost it X dollars on the occasion complained of.[9]

We interpret the Hyams Court's holding on this issue to mean that when officers of the corporation have taken possession of corporate property wrongfully and are holding it wrongfully, a stockholder is not barred from seeking to restore it to the corporation by the fact that the original wrongful taking occurred prior to his acquisition of the stock.[10]

In the case before us we have the similar situation of corporate property allegedly taken without justification by an officer before Plaintiff bought his stock but still retained by the officer in what Plaintiff

---

9. But see Palmer v. Morris, 316 F.2d 649 (5th Cir. 1963); 19 Am.Jur.2d Corporations, § 564; Annotation, 148 A.L.R. 1090.

10. The *Hyams* Court made clear its acceptance of the equitable principles that the stockholder has no standing if either he or his vendor participated or ac-

quiesced in the wrong and that it must appear from complaint and proof that the stockholder first made application for relief through corporate channels or that such application would have been ineffectual. Ulmer v. Maine Real Estate Co., supra; Trask v. Chase, 107 Me. 137, 77 A. 698 (1910).

claims is a defiance of the Corporation's right to have it returned.

Certainly the *Hyams* opinion makes clear that Maine decisional law does not bar the use of the derivative action by a subsequent purchaser *per se*, and the same attitude is reflected in our Maine Rules of Civil Procedure. Unlike its Federal counterpart, our M.R.C.P., Rule 23 does not require that shareholders who bring derivative actions to enforce duties owed by officers to the corporation must have owned their stock at the time of the wrong.

We must bear in mind that a stockholder's derivative action is an equitable remedy and equitable principles are controlling. At least when it is not established by statute, the rule of required ownership contemporary with the wrong does not appear to be absolute in jurisdictions which have accepted the rule. We find frequent use of qualifying language such as "unless the mismanagement or its effects continue and are injurious to him, or it affects him specially in some other manner". Jepsen v. Peterson, supra; Home Fire Ins. Co. v. Barber, supra.

 While we share the frequently expressed belief that a subsequent purchaser of stock should not be held to have purchased a grievance, we find nothing inequitable in a person's acquiring stock for the purpose of gaining a base from which to seek to redress a grievance which both he and the Corporation had previously suffered. We do not consider it necessary that the Plaintiff's motive in bringing the action be exclusively or even primarily for the benefit of the Corporation and its stockholders.[11] If, as Plaintiff claims here, an act of fraud and mismanagement has deprived him of property he has attached to secure his pending action, we see nothing inequitable in his attempting to broaden the base of his action by asserting

a derivative right which would, if successful, also secure corporate assets for the benefit of other creditors, if any.

*The Deadlock Statute.*

Finally, Plaintiff sought to avail himself of the use of 13 M.R.S.A. § 542(1)(B) as amended, the deadlock statute, which empowered the Court to enter judgment dissolving a corporation under certain circumstances. Among them were allegation and proof by a stockholder that

> "A(2) Through fraud, neglect, gross mismanagement of [the corporation's] affairs, attachment litigation or otherwise, its estate and effects are in danger of being wasted, or
>
> . . . . . .
>
> B(3) The corporation is otherwise deadlocked in its management."

The Single Justice found that Plaintiff had standing to pursue this aspect of his complaint but noted that a prior action for such relief had been brought by Laskey (Plaintiff's predecessor in ownership of shares) against Loew and he concluded—erroneously—that this action under the deadlock statute was still pending and that nothing would prevent Plaintiff from intervening and seeking his relief in that action. He, therefore, dismissed this aspect of Plaintiff's complaint without prejudice.

The Justice's information as to the status of Laskey's action was incomplete and the record discloses that this action had been dismissed under M.R.C.P., Rule 41(b)(1) on November 15, 1968.

Subsequent to the Justice's decree and the Plaintiff's appeal therefrom, the deadlock statute was repealed effective January 1, 1972.[12] In its place was enacted 13–A M.R.S.A. § 1115 which provides essentially the same relief to the stockholder on proof

11. We remind the reader, however, that stock holdings acquired in bad faith for such purposes as to assist a competitor to gain an advantage over the corporation are held not to furnish standing to bring a derivative action.

12. P.L.1971, ch. 439, § 25.

of substantially the same grounds among others:

"C. The shareholders are so divided respecting the management of the business and affairs of the corporation that the corporation is suffering or will suffer irreparable injury, or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally, or

D. The acts of the directors or those in control of the corporation are illegal or fraudulent; or

E. The corporate assets are being misapplied or wasted . . . ."

We agree with the Justice that Plaintiff's allegations as to corporate mismanagement, waste of assets and deadlock are sufficient to entitle him to seek relief on this ground.

The entry shall be:

Appeal sustained. Remanded to Superior Court for further proceedings consistent with this opinion.

WEBBER and WERNICK, JJ., did not sit.