141 N.J. Super. 568 (1976)
359 A.2d 504
ELMO G. VALLE, ET AL., PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS,
v.
NORTH JERSEY AUTOMOBILE CLUB, ETC. AND FLOYD HUGHES, ET AL., DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS. WILLIAM RICCARDO, PLAINTIFF-INTERVENOR-APPELLANT AND CROSS-RESPONDENT,
v.
JAMES T. WHITE, DEFENDANT ON COMPLAINT OF INTERVENOR-RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 1976.
Decided May 7, 1976.
*570 Before Judges CARTON, CRAHAY and HANDLER.
Mr. Howard Stern argued the cause for plaintiffs-appellants and cross-respondents Elmo G. Valle et al. (Mr. A. Crew Schielke, Jr., attorney).
Mr. James E. Flynn argued the cause for defendant-respondent and cross-appellant North Jersey Automobile Club (James P. Dugan, P.A., attorney).
Mr. Albert S. Gross argued the cause for defendants-respondents and cross-appellants Floyd Hughes, et al. (Messrs. Gross, Demetrakis & Sinisi, attorneys).
*571 Mr. John B. Hall argued the cause for plaintiff-intervenor-appellant and cross-respondent William Riccardo.
The opinion of the court was delivered by CARTON, P.J.A.D.
The original plaintiff, Valle, brought this action against defendant North Jersey Automobile Club and its directors, asserting various causes of action. The Club is a nonprofit corporation providing automobile service and other benefits to its membership under a franchise from the Automobile Association of America (AAA). The suit was originally commenced as an individual action and then, upon Riccardo's intervention, was certified a class action, Riccardo being named class representative. After the trial was concluded the theory of the action was again changed, the judge viewing the suit as derivative in nature.
Valle's principal claim, and later that of plaintiff-intervenor Riccardo, was that in 1951 the directors had violated their fiduciary obligation to the Club by acquiring an insurance agency (the Auto Club Agency of Hudson County) for their own interest.
The trial judge ruled that the defendant directors, in diverting this business to themselves, committed a breach of trust which wrongfully deprived the Automobile Club of a corporate business opportunity. However, the judge limited the Club's recovery for the breach of trust to the period that intervenor Riccardo was a member of the Club, holding that Valle was barred from bringing the action by equitable doctrines of laches and unclean hands. Valle was a member of the Club since 1951 and had been its accountant since 1950.
Having chosen this approach, the judge held defendant directors liable to the Club for damages from the time Riccardo became a member in 1965 to the time the insurance agency was turned over to the Club in 1971, rather than from the 1951 date of acquisition. As a measure of damages, the judge selected the salaries paid to the individuals in their capacities as officers of the Hudson Agency, less certain accrued value *572 turned over to the Club, for a total of $87,540. The judge also concluded that the directors who had not participated in the 1951 acquisition should not be held accountable for losses to the Club because they believed in good faith that a ratification meeting held in 1957 relieved them of any duty to urge transfer of the insurance agency to the Club.
Defendant directors primary challenge here is to the correctness of the court's ruling that they committed a breach of trust. On their cross-appeal plaintiffs challenge those rulings of the trial judge which (1) limited the period of the surcharge to a time contemporaneous with plaintiff Riccardo's membership in the Club; (2) found Valle chargeable with laches and unclean hands; (3) denied plaintiffs' request for a further accounting; (4) held that removal of the directors was not warranted; (5) turned back a challenge to certain provisions of the Club's by-laws (while sustaining another such attack); (6) rejected plaintiffs' arguments that monies used to establish pension funds for the directors should be refunded to the Club; (7) provided no award of counsel fees for that part of the action prior to Riccardo's intervention; (8) awarded no costs, and (9) held that the membership was entitled to access to the membership list.[1]
After reviewing the arguments of all parties, we conclude that, except with respect to its determination limiting the period of surcharge, the trial judge committed no error in his rulings. We express no opinion as to the rulings on the by-laws and membership list issues since subsequent amendments to the by-laws have rendered these questions moot.
In ruling on the question of damages the trial judge denied recovery for the period from 1951, when the breach of trust occurred, to 1965, when Riccardo became a member of the Club, on the basis of its determination that there was no *573 proper party to complain of the conduct during that period. In so doing the judge also concluded that the situation did not call for making any exception to the contemporaneous ownership-membership requirement in derivative actions on a theory that the conduct complained of constituted a continuing wrong. Before consideration of the propriety of the ruling limiting the period of the surcharge, a brief discussion of the law governing a corporate director's activities and a recitation of the facts surrounding the breach of trust is required.

I
At common law and by current authority in England and the United States, the directors of a private corporation are considered by equity to be in a fiduciary relationship with the corporation and its shareholders. 3 Fletcher, Cyclopedia of Corporations (1975 rev.), § 838 at 142. New Jersey is in accord with this seemingly universal rule. See, e.g., Hill Dredging Corp. v. Risley, 18 N.J. 501 (1955). The same standard applies in cases of nonprofit corporations. See Grace v. Grace Institute, 25 A.D.2d 277, 268 N.Y.S.2d 901 (App. Div. 1966); Mile-O-Mo Fishing Club v. Noble, 62 Ill. App.2d 50, 210 N.E.2d 12 (App. Ct. 1965); Cuthbert v. McNeil, 103 N.J. Eq. 199 (Ch. 1928).
The corporate opportunity concept is one aspect of the general rule that a fiduciary's loyalties may not be divided. 3 Fletcher, op. cit., § 861.1 at 208. In Guth v. Loft, 23 Del. Ch. 255, 5 A.2d 503 (Sup. Ct. 1939), the corporate opportunity doctrine was summarized as follows:
[I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if, in such circumstances, *574 the interests of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired. * * * [23 Del. Ch. at 272, 5 A.2d at 511]
New Jersey subscribes to this view of corporate opportunity. See, e.g., Solimine v. Hollander, 128 N.J. Eq. 228, 246 (Ch. 1940).
With the above standard in mind we turn to the virtually undisputed facts of this case. Prior to 1930 defendant Carleton Ritter operated his own insurance agency. In 1930 he became executive vice-president and general manager of the Auto Club. The Ritter Agency continued to operate until 1946.
In 1946 Ritter and three Auto Club directors (then called "trustees") formed the Paterson Agency.[2] The Paterson Agency, though nominally owned by the individuals, operated in all important respects as a department of the Club.
In 1951 the private ownership of the Paterson Agency led to a dispute among the trustees. One group, consisting of Floyd Hughes, Alexander Patterson, Sr. and Peter Calcia[3] felt that the Paterson Agency was a Club asset and, as such, should be owned by the Club and not by the individuals. In a pretrial deposition Patterson, Sr. commented, "I felt by being on the inside it should be a club matter * * *."
Following a threatened lawsuit, the dispute was settled, and the Paterson Agency has since July 1952 been owned and operated by the Club. The trial court concluded that the Club had been at least the beneficial owner of the Paterson *575 Agency since late February 1951. The record amply supports that finding.
In 1951 the Club's AAA franchise covered only Bergen and Passaic Counties. The AAA franchise for Hudson County was owned at that time by one Samuel Fletcher. In addition to operating the franchise, Fletcher owned a building and an insurance agency. At some point in 1951 it came to the attention of the Club's directors that Fletcher was interested in selling all three of his assets  the franchise, the agency and the building  as a package deal. It also came to the directors' attention that the holders of the Essex County AAA franchise were also interested in expanding and were specifically interested in the Fletcher package.
In the summer of 1951 Ritter, negotiating for the Club, offered Fletcher $135,000 for the package. Apparently, the holder of the Essex franchise had offered up to $120,000 for the Fletcher holdings.
Although there was some testimony that Fletcher did not want the Club to acquire the insurance agency in that he felt that auto clubs should not be in the insurance business, the contract was a freely assignable one. There was undisputed testimony that Fletcher wanted to sell the entire package[4] and that he did not care how payment of the $135,000 was allocated.
In a contract entered into in November 1951 the Auto Club agreed to purchase the building and the AAA franchise for a total price of $61,000. The agreement called for a cash payment of $35,000 with the balance secured by a mortgage on the property payable over an eight-year period.
Having decided that the Club could not also afford to purchase the insurance agency, the six then directors of the *576 Club (Calcia, Hughes, Gelzeiler, Oakley, Patterson, Sr. and Ritter) agreed to purchase the Fletcher Insurance Agency for themselves, taking title in a newly-created corporation called "Auto Club Agency of Hudson County." The purchase price for the insurance agency was set at $74,000. It is this transaction which forms the basis for the breach of trust charge.
The agreement required a downpayment of $5,000, with the balance payable over a period of eight years. In acquiring the Agency the individual directors undertook no personal liability. Fletcher continued to hold the stock in the Agency in escrow pending payment in full of the purchase price. The agreement provided that in the event of default, monies paid theretofore (and the shares of stock) would be forfeited to Fletcher.
In order to pay their respective shares of the cash downpayment, the six directors were each obliged to advance the sum of $833.33. In what one of them described as a "coincidence," the directors  a matter of just days prior to their having to close on the contract  voted themselves individual bonuses of $833.33 from Paterson Agency assets.[5]
Thus, in brief, the same six people (1) negotiated for the purchase of the Fletcher package deal; (2) concluded that the Club could not afford the whole thing; (3) negotiated the "split" in the cash downpayments; (4) negotiated the terms of liability for their personal acquisition, and (5) voted themselves a sum from the Paterson Agency which was coincidentally sufficient to enable them to put up the necessary cash downpayment for their personal acquisition.
From December 1951 up until November 1971 the six directors operated the Hudson Agency for their own account. Only four of these  Hughes, Patterson, Sr., Calcia and Ritter  now survive. In November 1971, after the present *577 action was instituted, the directors turned over the Hudson Agency to the Auto Club gratis. The Fletcher loan had long been repaid out of the Hudson Agency's earnings.
One of the defenses asserted by the defendant directors at trial was that the membership of the Club had ratified the 1951 transaction. It appears that in 1957 the stockholders of the Hudson Agency contacted counsel for advice concerning the propriety of the 1951 acquisition of the Fletcher Agency for their personal accounts. Counsel advised them that the acquisition was in violation of their fiduciary duties as directors and that the transaction was voidable at the option of the Club's membership. Counsel gave the further opinion that full disclosure of the transaction and an offer to transfer the Hudson Agency to the Club on the same terms under which it was purchased was in order and that if the membership rejected the offer, the directors could consider their actions ratified.
Following counsel's advice, the 1951 acquisition was discussed at the November 4, 1957 annual meeting of the Club. The members of the Club had not received notice that anything unusual was to be discussed at the meeting. A review of the manner in which the "disclosure" was made indicates that it was done, to say the least, in a diffident manner. The trial judge properly rejected the directors' claimed defense that the proceedings at the 1957 meeting amounted to a "ratification."
The record shows, and the trial judge found, that from 1951 to 1971 the Hudson Agency was operated in a manner almost indistinguishable from the club-owned Paterson Agency. The only real difference was that the Paterson Agency was a Club asset and the Hudson Agency was not. The Paterson Agency, for example, sold no insurance in Hudson County and, in fact, when residents of Hudson County approached the Paterson Agency for insurance these "leads" were referred to the Hudson Agency for servicing rather than being handled by the Paterson Agency. *578 The Hudson Agency and the Club's Hudson County office were in the same building. The Keystone Insurance Agency, which usually only wrote insurance for AAA-affiliated agencies, dealt with the Hudson and Paterson Agencies as if they were both divisions of the Club. The Club performed services for the Hudson Agency, although the Agency, in turn, reimbursed the Club. Additionally, the Hudson Agency advertised as if it was affiliated with the Club and received free advertising space in the Club's newsletter, The Traveler, and from 1952 until 1965 Hudson's employees were covered by the Club's pension plan.
In short, although the Hudson Agency was in fact owned by and operated for the benefit of an independent corporation owned in an individual capacity by the Club's directors, its independent status was not apparent. From this brief summary of the pertinent evidence it is clear that the record abundantly supports the trial judge's determination that defendant directors had violated their fiduciary obligation to the Club. Indeed, it would appear that the evidence in the record, none of which was in substantial dispute, mandated that conclusion.

II
We come, then, to the specific inquiry whether the trial judge correctly denied plaintiffs the benefit of the "continuing wrong" exception to the contemporaneous stock ownership-membership rule. Before discussing the exception, some background discussion on the "contemporaneous ownership" requirement is appropriate.
F.R.Civ.P. 23.1, governing derivative suits in the federal courts, is the model for our R. 4:32.5. See Pressler, Current New Jersey Rules, comment to R. 4:32-5. The New Jersey and federal rules follow an early United States Supreme Court decision which imposed the requirement that the plaintiff in a derivative action must have been a shareholder at the time of the transaction of which he complains. Hawes v. Oakland, 104 U.S. 540, 26 L.Ed. 827 (1882).
*579 One purpose of the rule, in the federal practice at least, was to prevent transfer of a share of stock to a nonresident holder for the purpose of acquiring federal diversity jurisdiction. Hence the rule's adoption by the states  in view of its peculiarly federal origins  has been criticized. See 13 Fletcher, Cyclopedia of Corporations (1970 rev.), § 5981 at 421. An additional rationale advanced for the rule is that it may operate to thwart the practice of acquiring a few shares of a corporation's stock in order to harass it with litigation and force a settlement favorable to the plaintiff, a practice commonly referred to as a "strike suit." See, e.g., Shapiro v. Magaziner, 418 Pa. 278, 210 A.2d 890 (Sup. Ct. 1965).
An exception to the requirement of contemporaneous ownership has developed when ownership is acquired after the wrong, but the wrong is a continuing one. The "continuing wrong" exception enables a plaintiff to maintain a derivative action if ownership (or membership) status was obtained "at any time the alleged wrong may be considered still in effect." 13 Fletcher, op. cit., § 5982 at 426.
In Amabile v. Lerner, 64 N.J. Super. 507 (Ch. Div. 1960), aff'd 74 N.J. Super. 443 (App. Div. 1962), the court recognized that the continuing wrong exception could  on proper facts  have application in New Jersey. Certainly the federal courts, operating under the parent rule to New Jersey's derivative suit rule, recognize the exception. See, e.g., Spalitta v. National Bank of New Orleans, 444 F.2d 291 (5 Cir.1971); see also, Forbes v. Wells Beach Casino, Inc., 307 A.2d 210 (Me. Sup. Jud. Ct. 1973), adopting the continuing wrong theory to sustain a derivative action seeking the return of corporate property wrongfully taken by corporate officers.
The present case clearly calls for application of the continuing wrong exception. Plaintiff Riccardo acquired his membership in 1965. Hence this is not a strike suit seeking to extort a personal settlement in the litigant's favor and at the Club's expense. More importantly, the initial wrongful *580 act by which the directors acquired the Hudson Agency in 1951 was not an event whose mischief was confined only to the date of its occurrence. The breach of fiduciary obligations and its consequences continued from that date until the time the directors surrendered the agency to the Club after the present suit was begun.
As the court commented in Forbes v. Wells Beach Casino, supra, "in a sense, all unrectified wrongs done to a corporation's financial stability are `continuing' [in that] the corporation will continue indefinitely to be X dollars poorer than it would have been if mismanagement had not cost it X dollars on the occasion complained of." 307 A.2d at 223. Here, however, the Club continued to suffer monetary losses for so long as income from the diverted property went to the directors personally instead of to the Club. Thus the breach of trust was a continuing one both because the wrongful conduct of the fiduciaries continued to exist and because it continued to yield a benefit to the directors and to injure the Club.
Nor can it fairly be argued that the directors were unaware that their conduct might be deemed wrongful. Recall that the directors themselves voiced a similar challenge in 1950 in the dispute with the other trustees over whether the Paterson Agency was a Club asset. In this connection, it should also be recalled that they received legal advice in 1957 reminding them that the acquisition of the Hudson Agency was in violation of their fiduciary duties.
In considering whether the Club should be foreclosed by failure of plaintiff Riccardo to meet the technical requirements of the contemporaneous ownership rule from recovering substantial monies diverted from it by the directors who breached their trust, it should be noted that in June 1972, when plaintiff Riccardo was permitted to intervene, he sought and obtained on order from the court designating the proceeding as a class action and himself as the class representative. As such, he represented the entire membership of the Club, *581 many of whom had been members since well before the 1951 acquisition of the Hudson Agency. From that ruling onward the action proceeded strictly as a class action and the date of his membership was not in issue. Date of membership did not become an issue until the trial judge altered the theory of the case, as the result of a post-trial motion, with respect to the breach of trust claim, treating it as a shareholders' derivative action rather than as a class action. The judge also denied an application to amend the proceedings so as to add as parties individuals who were members of the Club during the period for which recovery of damages was denied. These circumstances give added force to the conclusion that the benefits of the continuing wrong exception should have been extended to plaintiff Riccardo.[6]
The reasons advanced by the trial judge for refusing to apply the continuing wrong exception to the entire period of the breach of trust are not persuasive. He alluded to the difficulty in reconstructing events which occurred 15 or 20 years ago and the counterbalancing consideration that "complete justice and equity may be done in this case by considering Riccardo as the plaintiff in the derivative action and allowing recovery against defendant directors from the date that he became a member." The fact is that the judge's strict adherence to the technical rules pertaining to derivative actions (and the concomitant refusal to make a well-established exception to those rules) seriously limited the extent of the Club's recovery and thus hindered the accomplishment of complete justice and equity.
In its overriding obligation to bring about substantial justice, a court of equity should not subject itself to the *582 "tyranny of a formula." The anticipated difficulties of reconstructing events in order to accomplish complete justice are more fancied than real. Significantly, the trial judge found that there was abundant evidence on which to predicate its rulings not only as to the circumstances as to the breach of trust, but also on a variety of other complex issues. More directly to the point is the fact that the judge, when later assessing damages, determined that the "executive salaries" paid out by the Hudson Agency to the directors would serve as an equitable measure. Documentary evidence introduced at trial and utilized by the judge depicted the amounts paid in executive salaries from the very date of the acquisition of the Agency. Under the circumstances presented by the record, this method of measuring damages  although falling short of the amount claimed by plaintiffs to represent their total damages  was an appropriate one and an eminently fair one to defendants. Hence, no difficulty was presented for proving damages as to the remaining period during which the breach of trust continued.

III
Executive salaries for the years 1952 to 1964, inclusive, totaled $113,376. The amount of the judgment in favor of defendant North Jersey Automobile Club and against defendants Peter Calcia, Floyd Hughes, Carleton H. Ritter and Alexander Patterson is accordingly modified to increase the amount of the surcharge to a total of $200,916. Defendants are to be jointly and severally liable for the entire amount of the judgment, but each such individual defendant shall have the right of contribution against the others for his equal share of said $200,916.
Except as so modified, the judgment is affirmed in all respects.
HANDLER, J.A.D. (dissenting in part and concurring in part).
I disagree with the majority that the misapprehension *583 of the trial judge as to the significance of the status of plaintiff and plaintiff-intervenor compels an increase in the award of damages.
It is apparent from the full unabridged opinion of Judge Kole that the question of damages and the issues as to the standing of the respective plaintiffs were inextricably interrelated. In weighing the factors relevant to whether the infidelity of the directors should be considered a continuing wrong from its inception, the judge was necessarily implicating the ultimate issue of damages. This nexus between the issues of damages and standing is reflected in the observation of the trial judge that even were a "proper plaintiff" found, one whose ownership of stock at the time of the alleged wrong was not questionable, "equitable defense[s] might well limit recovery in any event."
It was determined, correctly but rather belatedly, that the breach of trust allegations should properly be considered a derivative action to enforce secondary rights under R. 4:32-5. The judge further concluded that as a derivative action on behalf of the Club there should be no exception to the general requirement that plaintiff be a shareholder or member at the time of the asserted wrong, the "contemporaneous ownership rule." In concluding, however, that the so-called "continuing wrong exception" to this general rule did not apply in these circumstances the judge may have been technically wrong. Thus, it is apparent that the date of the intervenor's membership in the Club, 1965, is completely fortuitous; it has no meaningful relationship to the purpose for the contemporaneous ownership rule or its continuing wrong exception; and it is not disputed that a "proper plaintiff," who would not have encumbered the Club by an application of the contemporaneous ownership rule, could have been obtained and substituted as a party. As pointed out by the majority, there is no suggestion that the intervenor here raised the spectre of a "strike" or nuisance suit.
*584 It is significant, nevertheless, that the trial judge did not focus on this factor. Rather, he emphasized in his ruling "other equitable considerations." These considerations are more compelling and, in my estimation, bear pointedly on the question of damages.
The equitable considerations reviewed by the trial judge were the nature of the wrong involved, good faith on the part of the directors, whether the corporation obtained substantial offsetting benefits, difficulties in assessing corporate injury, fairness to all the parties in permitting a stale claim to be brought as to a wrongful transaction occurring many years before the particular plaintiff acquired his interest, and whether a refusal to make the exception would produce an unjust or inequitable result.
Based upon his evaluation of these factors it was the conclusion of the trial judge that the "equities of the case" simply did not justify the exception sought by plaintiffs, the effect of which would have been the arbitrary extension of the period of recovery on behalf of the Club and would have created "an unjust result." Without becoming enmeshed in the rationale of the judge, his essential findings and reasons for limiting damages from 1965 forward are persuasive. He found that there were difficulties in proof inherent in reconstructing events many years after the fact, inaccurate testimony and records, and in particular unsatisfactory proofs as to profits as well as benefits accruing to the Club from Hudson over a long period of time. There is no warrant to discount these findings or to characterize them as more "fancied than real." The trial judge did not extend the recovery to the original date of the wrong in order to achieve "complete justice and equity" and a result which would be "fair to both the corporation and the defendant directors," and which would  I stress  "take into consideration the [equitable] factors already mentioned * * *."
I am satisfied that such equitable considerations  to repeat, the staleness of the claim, difficulties of proof, the absence *585 of bad faith or active fraud, apparent benefits and growth of the Club itself  underscore the essential fairness of the award and the decision to delimit the period of recovery. I see no sound reason to impugn the damages thus awarded. The evidence amply supports that award and militates against the imposition of greater damages by this court. On this facet of the case, I therefore dissent. I would affirm the judgment below.
NOTES
[1] The court's ruling on these and the numerous other issues raised in this action are set forth in Judge Kole's comprehensive opinion, an abridgement of which appears in Valle v. North Jersey Auto. Club, 125 N.J. Super. 302 (Ch. Div. 1973).
[2] The correct name of the Paterson Agency is "Auto Club Agency." This agency should not be confused with Auto Club Agency of Hudson, hereinafter referred to as the "Hudson Agency," which is the subject matter of this litigation.
[3] Hughes, Patterson, Sr. and Calcia are all defendants in the present suit.
[4] Although AAA franchises are technically not for sale, the distinction appears to be one without a difference. Apparently contiguous franchises of AAA-affiliated clubs may "merge" with the consent of the franchise holders and the approval of the national organization. It is patent here that Fletcher's approval of the merger depended on his getting the price he wanted.
[5] Recall that the trial judge found that the Paterson Agency was at that time at least a beneficial asset of the Club.
[6] We find it unnecessary to consider the alternate theses projected by plaintiffs: that (1) the trial judge erred in changing, after the case had been tried, the earlier order denominating the proceeding as a class action and designating Riccardo as class representative, and (2) having so ruled, he abused discretion in refusing to permit a substitution of parties in the derivative action.